### CAPEWELL HORSE NAIL CO. v. GREEN et al.

(Circuit Court of Appeals, Second Circuit. May 8, 1911.)

No. 268.

1. TRADE-MARKS AND TRADE-NAMES (§ 58*) — INFRINGEMENT — HORSESHOE NAILS.

Complainant, a maker of horseshoe nails, many years ago adopted a trade-mark, consisting of a check figure formed by intersecting lines, which was impressed on the bevel face of the heads of the nails, conforming to the shape of and practically covering such face. Defendant commenced the use of a similar check figure on one grade of its nails; the only material difference being that a triangular space in the center, having its base at the bottom of the face, was left plain. *Held*, that defendant's mark sufficiently resembled complainant's to deceive purchasers and to indicate an intention to do so, and constituted an infringement.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 66, 67; Dec. Dig. § 58.*]

---

**2.** TRADE-MARKS AND TRADE-NAMES (§ 93*)—SUIT FOR INFRINGEMENT—ESTOPPEL—LACHES.

In a suit to restrain infringement of a trade-mark, evidence *held* insufficient to sustain defendant's burden of proving an acquiescence by complainant, creating an estoppel, or to show laches which would defeat the suit.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 93.*]

**3.** TRADE-MARKS AND TRADE-NAMES (§ 97*)—INFRINGEMENT—FORM OF INJUNCTION.

A writ of injunction against infringement of a trade-mark, in addition to enjoining the precise design found to infringe, may properly include any mark "so similar to complainant's * * * as to be likely to deceive purchasers."

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 97.*]

**4.** TRADE-MARKS AND TRADE-NAMES (§ 98*)—SUIT FOR INFRINGEMENT—DECREE.

Where the manufacturer and sellers of an article were joined as defendants in a suit for infringement of a trade-mark, and defendants all answered and went to trial, on a finding of infringement, the court properly granted complete relief in the one suit, by awarding to complainant all the profits which defendants jointly and severally made from their infringement.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 98.*]

Appeal from the Circuit Court of the United States for the Northern District of New York.

Suit in equity by the Capewell Horse Nail Company against Edward M. Green and another. Decree for complainant (182 Fed. 404), and defendants appeal. Affirmed.

This cause comes here upon appeal from an interlocutory decree for injunction and accounting, entered against the defendants in the Northern District of New York. The suit was for infringement of trade-mark.

Robert W. Hardie, for appellants.
Edmund Wetmore and Oscar W. Jeffery, for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. The complainant has been engaged in the manufacture of horseshoe nails since 1881. Up to 1892 its nails were made with a smooth head. During that year it changed one of the heading dies in its machines, so as to produce a nail with small checks on the front face of the head. It has since then continuously used that mark. It makes three grades of nail, called, respectively, the "Capewell," the "Alligator," and the "Black Prince." The last named, a dark blue-black nail, is the lowest grade. The Capewell, a polished nail, is the highest grade, and has borne this mark on the front face of the head for very many years.

In 1905 it brought suit in Massachusetts against the Putnam Nail Company, alleging ownership of a common-law trade-mark, and

charging defendant with infringement. The cause was tried before Judge Colt, who dismissed the bill because of failure to prove that the mark had become associated in the public mind and among purchasers and users of nails with complainant's nail. Capewell Horse Nail Co. v. Putnam Nail Co. (C. C.) 140 Fed. 670.

In July, 1907, complainant brought another suit against one Mooney in the Northern district of New York, who was making and selling nails with a check mark which was a Chinese copy of complainant's. Much testimony was taken, and complainant prevailed. 167 Fed. (C. C.) 575. Upon appeal to this court the decree below was affirmed August 20, 1909. 172 Fed. 826, 97 C. C. A. 248. We found that the testimony which was lacking in the Putnam Nail Case had been abundantly supplied; that before 1892 various marks had been placed on the front face of nail heads, by others—initials, etc., including a globe with intersecting meridian lines (readily distinguishable from complainant's mark), but that complainant was the first to use the mark it claimed. We further found that such check mark had come to be generally known to the public as complainant's trade-mark, and that goods bearing such mark had come to be publicly known and distinguished as those of complainant's make. We held, therefore, affirming Judge Ray, that complainant had a common-law trade-mark, and that Mooney had infringed it.

In the case at bar the decree recites that complainant—

"is and since 1892 has been the owner of the trade-mark consisting of a pattern of small checks stamped upon the front face of the head of its horseshoe nails, commonly called a 'check mark,' and as heretofore used covering substantially such front of the head of the nail and generally conforming to the shape of such face, and because of the shape of the head (and face) having four sides, the upper and lower sides being parallel, but unequal in length, the upper being the longer; the right and left sides being of equal length, substantially but not parallel, and having within such boundaries thus conforming to the shape of such face of the head of the nail a pattern of small, but uniform, checks made by lines crossing each other at right angles or diagonally."

The evidence abundantly sustains this finding. To discuss that branch of the case would be merely to repeat what was said in the two opinions in the Mooney Case.

In the early part of 1907, more than 10 years after complainant's Capewell nail, with the check mark on its face, became known to the trade, the defendant Hoopeston Company placed upon the market a horse nail which it called the "Peerless." It already had a high-grade nail known as the "Hoopeston," with a distinctive mark of its own on the front face of the head. The "Peerless" was a lower grade of nail, and it was marked with a check mark on the front face, substantially the same as those of complainant and of Mooney; the only difference being that the tiny checks were squares, instead of diamonds. Suit being threatened, it altered the mark on its "Peerless" nails by cutting out a triangular piece from the bottom. At the same time it sent to its customers a card, giving illustrations of both forms of marking and containing this statement:

"It having been repeatedly brought to our attention that inferior nails were being substituted for our Peerless because of similar marking under

the head, we have changed our mark to make it more distinctive, that our numerous customers may be protected in getting the best."

Inspection of the two illustrations shows that defendant company still retained the check mark with which it had sought to associate its "Peerless," merely cutting out a portion of it. It was to restrain the use of this second design that this suit was brought.

[1] As we have seen, Judge Ray held, quite properly, that complainant was not entitled to all check marks of every shape, form, and description; there being some which would be so unlike its own as not to mislead any one. For that reason the decree describes the mark with such particularity, but it does not follow that identity must be shown in order to establish infringement. Before taking up this branch of the case, reference may be had to the following illustrations. Being taken from different sources, all are not drawn to the same scale; but it should be understood that the nails thus marked are of the standard sizes. No. 3 is a rough sketch from a nail marked as an exhibit, no drawing of it being found in the record.

No. 1 is the old "globe" mark which antedated complainant's. No. 2 is complainant's. Mooney's was the same. No. 3 is defendant's high-grade "Hoopeston" nail, which it used before it marked its "Peerless" nails in the manner indicated, and which it still uses. No. 4 is the mark defendant put on its "Peerless" nails for a few months in 1907, and No. 5 is the modified mark in use when this suit was brought.

Passing upon the question of infringement Judge Ray says:

"Knowing the Capewell trade-mark and looking at the defendant's nail, a purchaser or user would assume it to be a Capewell nail, unless specifically informed that nails with a check mark on the beveled side of the head, such check mark being formed of three triangular spaces, two check marked and the third one interposed plain, were not Capewell nails, but those of the

Hoopeston Company. Such a close copy and imitation is an infringement. It tends to confusion and deception. The resemblance is such as to deceive an ordinary purchaser giving such attention to the nails and the marks thereon as such a purchaser ordinarily gives, and cause him to purchase one supposing it to be the other. But it is said that defendant's nails are put up in packages, boxes, or cartons, with the name of the dealer thereon, and that one purchasing a package, box or carton is informed by the name on the package that the nails are not Capewell's. * * * So soon as the package is open and the nails displayed in store and shop, they at once pass for or are easily passed off as Capewell nails. Mistake, deception, and fraud are easy. * * * Purchasers and users understand that the names on packages do not necessarily indicate the maker, but also understand that the trade-mark or name on the articles themselves do."

In our former opinion it was stated that the evidence showed:

"That [five-pound] packages are frequently broken up, and the contents sold to users by the pound, and that users are accustomed to look to markings on the nail itself as identifying the maker."

There is similar testimony in this case.

We concur in the conclusion that both of defendant's "Peerless" marks infringe. As frequently happens in these cases, the visual comparison of the various marks is persuasive. The actual nails, with the marks on them, look more alike than the drawings do. Moreover, as often happens, the defendant unconsciously contributes evidence to the same effect. He is presumably well informed as to the conditions of trade in the articles he makes, and what measure of attention ultimate consumers of those articles are likely to give to their identifying marks. If it is apparant that he is undertaking closely to· approach to a well-known mark, it is generally a pretty safe assumption that he thinks the differences are not sufficiently great to prevent confusion. Fairbank v. Bell, 77 Fed. 870, 23 C. C. A. 554. Undoubtedly, as appellant contends, the question of *intent* does not enter into a suit on a trade-mark, as it does in one for unfair competition; but it is often illuminative on the question of infringement.

When infringement began in 1907, defendant had a mark of its own (No. 3, supra), highly distinctive, and which could by no possibility be confused with complainant's. That mark was impressed on their best model nails, which, as the record seems to indicate, are of excellent standard and favorably known. That mark is still retained. It it were thought well to indicate that the "Peerless" nails were also the product of the Hoopeston Company, it would surely have been easy to impress them with some modification of its own distinctive mark. The addition of a single curve would have changed the H in a shield which denoted the Hoopeston high grade nail to an HP in a shield to denote the Hoopeston "Peerless." We cannot escape the conviction that design No. 4 was· adopted because defendant's officer supposed it would lead some persons to think the "Peerless" nails were "Capewells," and that No. 5 was adopted because he supposed that, although there were differences to argue about, the resemblance between No. 5 and No. 2 was still strong enough to induce some confusion.

[2] Defendants also contend that this suit cannot be maintained, because complainant at one time acquiesced in the use by defendant

of design No. 5, and is therefore estopped from now insisting that it be abandoned. This is a question of fact, on which defendant has the burden of proof. The acquiescence is alleged to have taken place during a conversation between two persons, no one else being present. Their testimony as to what was said is diametrically opposed—oath against oath. We concur with the Circuit Court in the conclusion that defendants have not established their proposition by a fair preponderance of proof, and do not think it necessary to add anything to the discussion of the testimony, which is found in the opinion.

It is also contended that, because of laches on complainant's part, the bill should have been dismissed. It appears that, very shortly after defendant began putting Peerless nails on the market with design No. 4, complainant threatened suit, whereupon the use of this design was stopped. The next design, No. 5, was not put on the market till September, 1907, and there is no proof in the record (outside of the disputed testimony touching the interview which took place between Taylor and Williams) that complainant was informed of this design until January, 1908. But that is not material. Two months before this design was issued, complainant had begun the suit against Mooney, in which, with the handicap of the adverse decision in the Putnam Nail Case, it had to establish its ownership of a valid trade-mark. The Mooney Case did not terminate until our decision was filed August 20, 1909, and about a month later written notice was sent to the Hoopeston Company demanding that it cease infringement. Under these circumstances laches is certainly not made out. Timolat v. Franklin Boiler Works Co., 122 Fed. 69, 58 C. C. A. 405.

Some minor matters which have been referred to in argument may be briefly disposed of.

[3] It is insisted that the writ of injunction is erroneous, because it enjoins, not only the precise design found to infringe (No. 5), but also nails—

"bearing any mark so similar to complainant's said trade-mark as to be likely to deceive purchasers and the public and from infringing in any way complainant's exclusive right in said trade-mark."

This is in the usual form. Without some such general prohibition, defendants might put complainant to the trouble and expense of a new suit, merely by changing the position of the triangular nick they have cut out of the original check mark, or by changing its shape from a triangle to a square or circle of the same area—manifestly colorable changes, which would equally infringe the original mark. We find no force in the suggestion that the writ does not describe the trade-mark as fully as the decree of injunction does. That is immaterial. It is the decree, and not the writ, which must be looked to in order to ascertain what the trade-mark is to which complainant has established title.

It is next assigned as error that the decree enjoins the defendant company from making infringing nails, as well as from selling them when made. The theory advanced is that it is necessary to have

knurling of some sort on one of the head dies; otherwise, the nail would slip while being rolled. The check mark, impressed by this die could be afterwards removed before selling, if it infringed a trademark; but it is vehemently contended that the injunction as it stands would necessarily be violated as a mere incident of manufacture. It is a suspicious circumstance that defendant company is so insistent upon being allowed to make nails with an infringing mark on them, which it will afterwards have to obliterate by some further process of manufacture. This very insistence indicates the propriety of the comprehensive language used in the decree. The argument in support of defendant's contention may be briefly answered. We had this same question as to the necessity of using a die which would grip the nail when passing through the rollers in the Mooney Case, and held that such necessity had not been established by a fair preponderance of proof. But as we said in our former opinion:

"If it was necessary to have a gripping surface on the roller, it was not necessary to use the only one of many which would produce on the face of the nail head the counterpart of complainant's distinguishing mark."

That statement is proved in this case. Defendant has had no difficulty in making a first-class grade of nail which did not slip in the process of rolling, being gripped by a pattern cut on die or roller, but which left on the nail face a mark in no way resembling complainant's. A glance at the "Hoopeston" nail No. 3 with the capital H in a shield shows how fallacious is the argument here advanced.

[4] It is also contended that the decree is erroneous, because not limited to the joint infringement of the three defendants. This, of course, refers only to the provisions as to profits and damages. The Hoopeston Company is a resident of Illinois. Green and Sanford are residents of the Northern district of New York. They sold nails which the company had manufactured. All three were sued, and the defendant company appeared generally, answered, and conducted the defense. The bill is framed to recover jointly and severally against all three defendants for separate infringements. It was not demurred to, and the case went to final hearing under that issue. Continuing infringements were proved, and the court properly granted complete relief in the one suit, by awarding all the profits which the defendants jointly and severally have made from their infringement.

The decree is affirmed, with costs.