Cynthia GREY, an individual doing business as Dogiva, Ltd., Plaintiff,

v.

CAMPBELL SOUP COMPANY, a New Jersey corporation, Defendant.

No. CV 83–7291–RJK (gx).

United States District Court, C.D. California.

Sept. 12, 1986.

Cooper, Epstein & Hurewitz, Michael A. Painter, Steve W. Ackerman, Beverly Hills, Cal., for plaintiff.

Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst, Byard G. Nilsson, Harold E. Wurst, Leonard D. Messinger, Los Angeles, Cal., Banner, Birch, McKie & Beckett, Alan S. Cooper, Kathy J. McKnight, Washington, D.C., for defendant.

### MEMORANDUM OF DECISION AND ORDER

KELLEHER, Senior District Judge.

### I. INTRODUCTION

This is an action for declaratory relief arising out of the marketing and sale of DOGIVA dog biscuits by plaintiff Cynthia Grey (hereinafter "Grey") and former counterclaim defendant Saks. Defendant Campbell Soup Company (hereinafter "Campbell"), owner of the trademark GODIVA, counterclaimed for unfair competition, trademark and trade dress infringement and trademark dilution based on Grey's use of the confusingly similar marks DOGIVA and CATIVA, the business name "Dogiva, Ltd." and the intentional imitation of Campbell's distinctive gold foil ballotin trade dress. Grey's principal defense was that in February or March of 1982, Alfred J. Pechenik (hereinafter "Pechenik"), while president of Campbell's subsidiary Godiva, gave Grey permission to use the term DOGIVA and the infringing packaging for her product.

A two-day bench trial was held on May 13 and 14, 1986. The primary factual issue was whether Pechenik gave Grey permission to use DOGIVA and the silver foil trade dress. The remaining issues related to the strength of the mark GODIVA, whether the gold foil ballotin trade dress had acquired secondary meaning, Grey's intent in adopting DOGIVA, and whether Grey's use of DOGIVA, CATIVA and/or the silver foil trade dress is likely to cause confusion and to dilute the distinctive quality of the trademark GODIVA.

This is not a typical trademark case; it involves an intentional infringement and the assertion of a permission defense designed to justify that infringement. Because the factual question of permission was the dominant issue at trial, it is discussed first.

### II. ACQUIESCENCE OR PERMISSION DEFENSE

#### A. *Burden of Proof*

Acquiescence or permission is an affirmative defense. 1 Gilson, *Trademark Protection and Practice*, § 8.12(12)(e), p. 8–127 (1985). Accordingly, Grey has the burden of proving that defense by a pre-

ponderance of satisfactory evidence. *Capewell Horse Nail Co. v. Green*, 182 F. 404, 405 (N.D.N.Y.1910), *aff'd*, 188 F. 20 (2d Cir.1911).

### B. *The Permission Defense is Unsupported*

#### 1. *Introduction*

Reduced to its essentials, Grey's story is that she thought of a pet product idea and the names DOGIVA and CATIVA; she talked to friends about her idea. On the advice of her husband, she called Godiva to see if there was any problem with her use of DOGIVA and the silver foil packaging. Grey allegedly spoke with Pechenik in February or March of 1982 while Pechenik was president of Godiva; he gave her permission and she confirmed that permission in a letter, which cannot be found.

The Court concludes that this story is untenable. While some of the underlying factual details may be true, they did not happen when and how Grey said they did. The evidence shows that what actually occurred is that sometime in early 1983, Grey developed the DOGIVA product idea. She sent handmade prototypes of DOGIVA boxes to several leading department stores, among the first of which were Neiman-Marcus, Saks, and Bloomingdale's. The prototype sent to Bloomingdale's was received by Jeanne Sacklow, who showed it to Pechenik on April 28, 1983, ten months after he left Godiva. The evidence shows this was the first time Pechenik ever heard of DOGIVA and Grey. By that time Pechenik had organized Gourmet Resources, Inc., a competitor in the chocolate field. Pechenik telephoned Grey sometime between April 28 and May 11, 1983 and encouraged her in this project.

In the spring and summer of 1983, Grey began the production, marketing and sale of her product. After she received Campbell's cease-and-desist letter, Grey filed this action.

#### 2. *Chain of Events*

Grey began marketing the DOGIVA product by calling department store buyers in April or May of 1983. One of her first calls was to Bloomingdale's. Although prior to trial, Grey could not recall to whom she spoke at Bloomingdale's, it is clear from Jeanne Sacklow's deposition and Grey's testimony at trial that Sacklow was that individual.

One of Sacklow's duties at Bloomingdale's was to screen vendors and their products. In that capacity, Sacklow knew Pechenik, knew that he had been president of Godiva, and in 1983 knew that Pechenik was at Gourmet Resources. At a meeting on April 28, 1983, Sacklow showed Pechenik the DOGIVA prototype. It is clear from Sacklow's testimony that April 28, 1983 was the first time Pechenik had ever heard of DOGIVA or Grey. Indeed, Pechenik asked Sacklow "who invented this?" and "did Godiva give her permission to do this?"

Sacklow gave Grey's name to Pechenik and, in a subsequent telephone conversation with Grey, Sacklow also advised Grey that Pechenik was interested in the DOGIVA product. In that conversation, Grey gave no indication to Sacklow that she (Grey) had ever talked to Pechenik before, just as Grey had said nothing about permission in response to Sacklow's earlier questions regarding legal clearance to market the DOGIVA product.

Within a few days after April 28, 1983, Pechenik telephoned Grey. Pechenik identified himself as Jeanne Sacklow's friend and he told Grey that he had seen the DOGIVA product. Pechenik told Grey her product was a "great gimmick" and that it would take Godiva two years to "get their act together" to sue her. Based on his experience at Godiva, Pechenik advised Grey on possible suppliers, prospective customers, and also on a strategy to develop media interest in her product.

Grey's notes on her first conversation with Pechenik were received in evidence. The reference in the upper left hand corner of Grey's notes identifies the caller as "Gene Sackel's [sic: Jeanne Sacklow] friend." Clearly Pechenik would have no

need to identify himself in this manner if Grey already knew who he was by virtue of the "permission conversation" in February or March of 1982.

After introducing himself, Pechenik and Grey discussed her product. As the second paragraph of Grey's notes illustrates, Pechenik told Grey that Simpkins Industries made the GODIVA box; he gave her Morty Simpkins' name and telephone number in Pennsylvania and told her how much Godiva paid for its boxes. Diane Anderson confirmed this when she testified that Pechenik told Grey "where to go for the boxing."

Grey's notes clearly represent Pechenik's advice to Grey on how to negotiate with Saks: *"Don't* sign an exclusive! The New York market is worth about $800,000 minimum." On April 22, 1983, Grey had sent a DOGIVA prototype to Saks. After receiving the sample, Eileen Lippel, a buyer at Saks, called Grey and discussed the possibility of an exclusive on Grey's product for the Saks' catalog.

Grey's notes also reflect Pechenik's advice as to where Grey could obtain trays for her product. He gave her the name and telephone number of Jerry Shapiro of Bleyer Industries in New York, who in fact supplied Grey with the trays and padding inserts which she used. As former president of Godiva, Pechenik knew that Mr. Shapiro supplied the trays for the GODIVA ballotins.

Grey's notes also represent Pechenik's marketing advice. Grey admits that the suggestion to "print up 5,000 fact sheets and deliver them to every TV station, radio station, newspaper and magazine that you can think of" "could contain some thoughts" from Pechenik, although she claims that this paragraph reflects a "combination" of advice from Pechenik and a public relations firm.

### 3. Conflicts and Contradictions

Grey's story is internally inconsistent and is contradicted in significant part by the testimony of others and documentary evidence.

### a. Timing and Derivation of DOGIVA

On December 9, 1983, Grey testified that she thought of the name DOGIVA "last Valentine's Day which would be February, 1982...." In her Declaration executed on December 12, 1983, Grey also stated that she derived DOGIVA around Valentine's Day 1982. Indeed, Grey "knows" she called Pechenik in February or March of 1982 "because ... it was right around Valentine's Day or after."

Yet at trial, Grey testified that she actually thought of the name DOGIVA on Valentine's Day *1981*. When asked to explain the discrepancy, Grey stated that it would have been "impossible" for her to think of the name on Valentine's Day *1982* and then call Pechenik one week later with a product in mind. In addition to it being a very strange coincidence that Grey would think of the name DOGIVA on Valentine's Day *1981* and then happen to call Pechenik on or around Valentine's Day *1982*, this explanation simply does not agree with Grey's prior testimony and other portions of her trial testimony.

At her deposition on April 20, 1984, Grey testified as to the timing and sequence of events in the development of her product. Grey's story then was that in February 1982 she thought of the name DOGIVA and began talking to suppliers and friends about the product. During this same period of time, she said she made DOGIVA prototypes and had the artwork and embossing plates made. All of this activity supposedly occurred in a three-to-four-month period beginning in February or March of 1982 at the same time she allegedly contacted Pechenik. At trial, Grey changed the date of conception of DOGIVA from 1982 to 1981 because it would have been "impossible" for her to have a complete product in mind in February 1982. This directly contradicts all of her prior testimony regarding the contemporaneous activities which place the "permission" call in 1982.

### b. Details of Permission Story

At trial, Grey testified that the alleged permission occurred during a telephone call

which Pechenik made to Grey at her home. However, before trial, Grey clearly stated that she made the call to Pechenik and spoke to him from a telephone booth. Pechenik corroborated Gray's testimony that she telephoned him. When asked for details regarding the call, Pechenik stated that he was in his office. At no time did Pechenik ever intimate that he called Grey in February or March of 1982. Indeed, Pechenik said that if Grey gave him her telephone number during her call to him, he did not record it.

As to why Grey changed her testimony at trial, it is evident that the original "phone booth" story, apart from being implausible, was unsubstantiated. Grey provided no documentary evidence to confirm that the call was made. Grey changed the telephone booth story at trial to match the corroborating testimony of one of her closest friends, Diane Anderson, who said that she was at Grey's home when the permission call occurred. Throughout the many months this action has been pending, Grey "forgot completely" about Anderson's presence during the "permission" call. It was only the day before trial that Anderson "refreshed" her memory.

This is implausible. Grey spoke with Anderson "at least every other day" about numerous matters, including, no doubt, the filing of this lawsuit, Grey's depositions, and the impending trial of this case. It is incredible that Anderson would not have "refreshed" Grey's memory as to Anderson's presence during the "permission" call until the day before trial.

Judy Blum testified that when Grey first mentioned DOGIVA to her, she advised Grey to "check it out and make sure there would be no problem." This is contrary to Grey's deposition testimony that she did not recall which of her friends had raised a question about her use of DOGIVA. Moreover, it is inconsistent with Grey's testimony, the first day of trial, when Grey said that she still was not sure which of her friends had raised a question about her use of DOGIVA but that she would have remembered if it were "one of my really close girl friends." On the second day of trial, Ms. Blum, a friend who is "very close" and "like sisters" with Grey, testified that she indeed was one who had raised a question about DOGIVA.

At trial, Grey also testified that, after the "permission" call, she told several of her friends about that conversation. This differs from her earlier testimony that she had told no one but her husband and, later on, her attorney about the call.

### 4. Pechenik's Testimony is Unworthy of Belief

#### a. Prior Inconsistent Statements and Conduct

Pechenik was well aware of the value of the trademark GODIVA and its image in the marketplace, characterizing it as an important asset belonging to Godiva's stockholders. Consistent with this attitude and in accordance with Campbell's corporate policy, Pechenik typically reported matters involving the trademark GODIVA to Campbell's legal department for resolution. Although Pechenik now states that it was not his practice to put day-to-day matters in writing, the record discloses a number of trademark infringement and misuse situations which Pechenik did report in writing and against which he strongly urged that action be taken.

For example, in December 1980, Pechenik advised Mr. Baughman of Campbell's legal department of the use of "Lady Godiva Ice Cream" by a retail shop in Houston, Texas. In that correspondence Pechenik stated, "I certainly hope there are sufficient legal grounds to put a stop to this immediately." Similarly, in February 1981, Pechenik corresponded with Mr. Baughman regarding the use of GODIVA on T-shirts. In that correspondence, Pechenik stated, "[a]nother entrepreneur who thinks they can use our name. Please tell them to stop immediately!"

These examples and others demonstrate that Pechenik took an aggressive posture against "entrepreneurs" such as Grey who were attempting to trade on the GODIVA

name and image and that he routinely referred such matters to Campbell's legal department for handling. Pechenik's claim that he acted differently with respect to DOGIVA is not worthy of belief.

b. *Implausibility of Pechenik's Story*

There is a basic implausibility in Pechenik's story. Pechenik claims to have given permission over the telephone to a woman he did not know without ever having seen her product, without consulting Campbell's legal department, without reporting it to his superiors or colleagues, and without making any record of the conversation. He even claims to have written the message "good luck" on Grey's "confirming letter" before returning it to her, but he did not show or mention that letter to anyone, much less make a copy. This purported conduct is not consistent with Pechenik's description of his position and responsibilites.

### III. LIABILITY

A. *The Trademark "Godiva" is Strong and Entitled to a Broad Scope of Protection*

Campbell's ownership and the validity of the trademark GODIVA and the status of Registration Nos. 836,376 and 1,010,809 of that trademark are not in issue.

█ In determining whether a trademark is strong, the Court considers its inherent distinctiveness, the duration of its use, the volume of products sold under the trademark, and the amount of advertising expenditures devoted to the trademark. *See, e.g., Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 151–53 (9th Cir.), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963); *National Lead Co. v. Wolfe*, 223 F.2d 195, 197–200 (9th Cir.), *cert. denied*, 350 U.S. 883, 76 S.Ct. 135, 100 L.Ed. 778 (1955). It is admitted that the trademark GODIVA, as applied to Godiva's products, is wholly arbitrary and fanciful; it has no descriptive or suggestive meaning when used for such products and therefore is inherently distinctive. *See Fleischmann*, 314 F.2d at 154. It is also admitted that the trademark GODIVA has been used continuously on chocolates and candy since 1960 and that since 1979 sales and advertising expenditures for GODIVA food products have exceeded $65,000,000 and $8,750,000, respectively.

The trademark GODIVA is used on all of Godiva's products and has been extensively advertised in a variety of media including magazines, point-of-sale materials, mail-order catalogs, television and radio commercials, newspaper advertisements, department store catalogs, and charge account inserts. Such substantial advertising and sales of GODIVA chocolates and other food products consitute compelling circumstantial evidence of the strength of this trademark and have resulted in a high degree of public awareness of the trademark GODIVA. GODIVA accordingly is an arbitrary, fanciful and strong mark and, as a matter of law, is afforded broad ambit of protection from infringing uses. *E.g., AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir.1979).

B. *Godiva's Gold Foil Ballotin Trade Dress Has Acquired Secondary Meaning*

█ To establish trademark dress infringement, Campbell must show, *inter alia*, that its gold foil ballotin has acquired secondary meaning. *See, e.g., Fabrica Inc. v. El Dorado Corp.*, 697 F.2d 890, 894 (9th Cir.1983); *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343 (9th Cir.1952). Secondary meaning is achieved when purchasers associate a particular name or trade dress with one source of the product. *See, e.g., Transgo Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).

█ Secondary meaning is established in part by the testimony of Thomas Fey, president of Godiva, that the ballotins account for as much as seventy percent of Godiva's business, and by the extensive advertising of GODIVA chocolates in which the gold

foil ballotin trade dress is prominently displayed. *E.g., Uniden Corp. of America v. Unipacific Corp.,* 223 USPQ 70, 74 (C.D. Cal.1983); *Clairol Inc. v. Cosway Co., Inc.,* 184 USPQ 583, 586 (C.D.Cal.1974). The ballotin also is prominently displayed at department stores where GODIVA chocolates are sold.

The testimony of Joseph Deutsch, Godiva's Vice President-Sales, that the one-pound ballotin is the "Godiva signature" and is "synonymous with Godiva" is persuasive evidence of the secondary meaning which the gold foil ballotin has acquired, particularly in view of his many years of experience in the chocolate industry. Even Pechenik acknowledged that the gold ballotin is "Godiva's trademark, part of their identification."

As discussed below, Grey designed her packaging with the GODIVA gold foil ballotin in mind. The fact of deliberate and close imitation often is sufficient to establish secondary meaning. *Audio Fidelity Inc. v. High Fidelity Recording, Inc.,* 283 F.2d 551 at 558 (9th Cir.1960); *St. Ives Laboratories v. Nature's Own Laboratories,* 529 F.Supp. 347 349–50 (C.D.Cal.1981); *Clairol,* 184 USPQ at 586.

### C. *Grey Intentionally Adopted "Dogiva," "Cativa" and the Silver Foil Trade Dress to Trade on the Public Recognition of "Godiva"*

■ Evidence of the intentional adoption of an infringing trademark in order to trade upon or otherwise benefit from the trademark owner's goodwill and reputation is not required to establish likelihood of confusion. *E.g., Fleischmann,* 314 F.2d at 157–58; *Stork Restaurant, Inc. v. Sahati,* 166 F.2d 348, 360 (9th Cir.1948). However, evidence of such wrongful intent, in addition to being weighed as an equitable consideration, is probative of likelihood of confusion. *AMF,* 599 F.2d at 348, n. 9. When an infringer such as Grey knowingly adopts a confusingly similar mark, it is presumed that the public is deceived. *AMF,* 599 F.2d at 354; *Fleischmann,* 314 F.2d at 158; *Sperry Rand Corp. v. Seawol*

*Distributors, Inc.,* 140 USPQ 532, 536 (S.D. Cal.1964).

■ At the time Grey conceived the trademark DOGIVA, she had been aware of Godiva's prior use of GODIVA and the gold foil ballotin trade dress for at least five years and, in fact, previously had purchased GODIVA chocolates. Grey's explanation of the circumstances surrounding her adoption of DOGIVA and her denial of any thought of GODIVA simply are not credible.

### D. *Grey's Use of "Dogiva," "Cativa" and the Silver Foil Trade Dress is Likely to Cause Confusion*

■ The tests for infringement of a federally registered mark under § 32(1), 15 U.S.C. § 1114(1), infringement of a common law trademark, unfair competition under § 43(a), 15 U.S.C. § 1125(a), and common law unfair competition involving trademarks are the same: whether confusion is likely. *New West Corp. v. NYM Co. of Val., Inc.,* 595 F.2d 1194, 1201 (9th Cir. 1979); *Visa International Service Association v. Visa Hotel Group, Inc.,* 561 F.Supp. 984, 989 (D.Nev.1983). Likelihood of confusion also is required to establish trade dress infringement. *Fabrica,* 697 F.2d at 894.

Likelihood of confusion is not limited only to confusion as to the source or origin of the goods. Rather, the appropriate inquiry is whether the average purchaser would be likely to believe that the infringer's product has "some connection" with the trademark owner. *E.g., Steinway & Sons v. Robert Demars & Friends,* 210 USPQ 954, 964 (C.D.Cal.1981).

■ In determining whether confusion is likely, the Ninth Circuit considers the following factors: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) infringer's intent in selecting the trademark; and (8) likelihood of expansion of product lines.

*E.g., AMF,* 599 F.2d at 348–49. These factors are not all-inclusive; other variables may be considered depending on the particular factual circumstances of the case. *Id.* at 348, n. 11. No one factor in this analysis, because of its presence or absence, is in itself determinative of likelihood of confusion. *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1099 (2d Cir.1969), *cert. dismissed,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970). The relevant *AMF* factors are discussed below.

### 1. *Strength of the Mark*

GODIVA is an arbitrary, fanciful and inherently strong trademark. It is heavily advertised, widely used and well known. As a matter of law, the trademark GODIVA is afforded the broadest ambit of protection from infringing uses. *E.g., AMF,* 599 F.2d at 349.

### 2. *Proximity of the Goods*

Related goods are those products which reasonably would be thought by the buying public to come from the same source or have some connection if sold under the same or confusingly similar marks. *AMF,* 599 F.2d at 348, n. 10; *Visa International,* 561 F.Supp. at 991. As long as the public believes there is some connection between GODIVA chocolates and DOGIVA dog biscuits, it is immaterial whether the public thinks that the producer of GODIVA chocolates actually is making and selling DOGIVA dog biscuits, whether DOGIVA dog biscuits are being produced under its supervision, or whether some other arrangement exists. Consumers are not concerned with such details. *Fleischmann,* 314 F.2d at 155.

The record clearly demonstrates that consumers are likely to believe that GODIVA chocolates and DOGIVA dog buscuits have the requisite connection.

### 3. *Similarity of the Marks*

When two products such as GODIVA chocolates and DOGIVA dog biscuits are so closely related as a result of similar packaging and commercial appeal, movement through the same or similar channels of trade, and the same or overlapping classes of purchasers involved, a diminished standard of similarity must be applied when comparing the trademarks in issue. *See AMF,* 599 F.2d at 350.

The trademarks GODIVA and DOGIVA are substantially similar in appearance and pronunciation; the only difference between the trademarks is a simple transposition of the letters "G" and "D." The marks GODIVA and CATIVA also are confusingly similar, particularly in view of the close resemblance between the packaging in which those products are sold. Indeed, if one wanted to market "gourmet" pet food products which trade on the reputation of GODIVA, the marks DOGIVA and CATIVA are the obvious and natural choices.

This confusing similarity was recognized by the Patent and Trademark Office which refused registration of DOGIVA and CATIVA under § 2(d) of the Federal Trademark Act, 15 U.S.C. § 1052(d), based on the prior registration of GODIVA. Such uncontested administrative action is given some consideration. *E.g., Carling Brewing Co. v. Philip Morris Inc.,* 297 F.Supp. 1330 (N.D. Ga.1968).

### 4. *Evidence of Actual Confusion*

Evidence of actual confusion is not required to establish likelihood of confusion. *E.g., New West,* 595 F.2d at 1201; *Fleischmann,* 314 F.2d at 159, n. 13. However, past confusion is persuasive proof that future confusion is likely. *AMF,* 599 F.2d at 352; *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.,* 532 F.Supp. 651, 660 (W.D.Wash. 1982).

Grey's use of DOGIVA and the silver foil trade dress prompted several department store buyers to inquire whether Grey had Godiva's permission to use DOGIVA. Such inquiries from professional purchasers are persuasive circumstantial evidence that the ordinary buying public similarly would be confused.

### 5. Marketing Channels

As indicated above, GODIVA chocolates and DOGIVA dog biscuits are offered for sale to many of the same department store buyers, are promoted through the same department store catalogs, and are sold to the same or overlapping groups of consumers through many of the same department stores, and often in the same areas of these stores. As a consequence of such convergent marketing channels, likelihood of confusion is increased. *See, e.g., AMF,* 599 F.2d at 353; 2 McCarthy, *Trademarks and Unfair Competition,* § 24:6, p. 185 (2d Ed. 1984).

### 6. Type of Goods and Degree of Purchaser Care

In assessing likelihood of confusion, the standard used is the typical buyer exercising ordinary care, including the ignorant, the inexperienced and the credulous. *Fleischmann,* 314 F.2d at 156; *Stork Restaurant,* 166 F.2d at 359. Both GODIVA and DOGIVA products are purchased as gifts or impulse items by ordinary members of the purchasing public. Although GODIVA chocolates and DOGIVA dog biscuits are more expensive than some other types of chocolates and dog biscuits, neither product is so expensive as to require a high degree of care by purchasers.

### 7. Infringer's Intent

Grey conceived of the mark DOGIVA and the silver foil trade dress with knowledge of the prior use of GODIVA and the gold foil ballotin trade dress. Grey's explanation of the circumstances surrounding her adoption of DOGIVA is not credible and is contradicted by her statements to Candice Butler that she (Grey) decided to use DOGIVA because it was a clever play on GODIVA. Implicit in that belief is the assumption that the public would associate DOGIVA dog biscuits with GODIVA chocolates, thereby enhancing the marketability of her product.

### E. Grey's Use of "Dogiva" and "Cativa" is Likely to Dilute the Distinctive Quality of the Mark "Godiva"

The California Anti-Dilution Statute, Cal. Bus. & Prof. Code § 14330, provides for injunctive relief against the use of a designation which is likely to dilute the distinctiveness of a registered or valid common law trademark or otherwise injure the business reputation of the trademark owner. Section 14330 does not require competition, confusion as to the source of the goods, or proof that Grey intended to trade on the public recognition of GODIVA. *Steinway,* 210 USPQ at 963.

The mark GODIVA is wholly arbitrary and fanciful when used for food products; it has no descriptive or suggestive meaning. GODIVA thus is inherently distinctive and, as a result of long use and substantial advertising and sales, has become well known to the public. GODIVA accordingly is a strong mark entitled to protection against dilution. *See* 2 McCarthy, *supra,* § 24.14, at 224–26.

Grey's use of the confusingly similar trademarks DOGIVA and CATIVA will result in the gradual whittling away of the distinctiveness of the trademark GODIVA. It is precisely this type of injury which § 14330 is intended to prevent. *Steinway,* 210 USPQ at 963. Moreover, Grey's use of DOGIVA and CATIVA also injures Campbell's business reputation because of the association which the public makes between DOGIVA and CATIVA treats for animals and GODIVA premium quality food products which are intended for human consumption. *See Steinway,* 210 USPQ at 964.

## IV. REMEDIES

### A. Injunctive Relief

Campbell has shown by a clear preponderance of the evidence (1) that the mark GODIVA is valid and/or that the distinctive gold foil ballotin trade dress has acquired secondary meaning; (2) that use of the trademark DOGIVA, the trademark CATIVA, and/or the silver foil trade dress

is likely to cause confusion and/or dilute the distinctive quality of the mark GODIVA; and (3) that the legal remedy by way of damages is inadequate.

### B. *Accounting of Profits*

An accounting of the infringer's profits is governed by § 35(a) of the Federal Trademark Act, 15 U.S.C. § 1117(a), which provides in pertinent part that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed...." Copies of invoices showing Grey's sales of DOGIVA and CATIVA products are in evidence. There is little or no proof of costs or deductions which, under § 35(a), Grey must show to reduce that sales figure.

### C. *Attorney's Fees*

Section 35(a) of The Federal Trademark Act, 15 U.S.C. § 1117(a), was amended in 1975 to provide that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." This remedy is available both in cases of trademark infringement under the Federal Trademark Act, 15 U.S.C. § 1114(1) and § 32(1), and unfair competition under 43(a) of that Act, 15 U.S.C. § 1125(a). *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1026 (9th Cir.1985), cert. denied, —— U.S. ——, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).

Attorney's fees may be awarded when the Court finds that the losing party has engaged in bad faith or inequitable conduct which would make it grossly unjust for the prevailing party to be left with the burden of its litigation expenses. *Crab Cooker Specialty Restaurants Corp.*, 223 USPQ 233, 237 (C.D.Cal.1983); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 211 USPQ 217, 222 (C.D.Cal.1981). Thus, "exceptional cases" have been found where the infringement is fraudulent, willful or deliberate. *E.g., Bagdasarian Productions v. Audiofidelity Enterprises, Inc.*, 227 USPQ 735 (3d Cir.1985); *Selchow & Righter, Inc. v. Decipher, Inc.*, 228 USPQ 374 (E.D.Va.1985).

Much of the attorney's fees expended by Campbell during the course of this litigation were necessitated by its opposition to Grey's motion for summary judgment based on the permission defense and the extensive discovery required to demonstrate its utter falsity at trial. *Cf. Faberge, Inc. v. Saxony Products, Inc.*, 605 F.2d 426, 429 (9th Cir.1979).

### CONCLUSION

Defendant is entitled to a permanent injunction prohibiting plaintiff from any and all further use of the trademark DOGIVA, the trademark CATIVA, or the silver foil trade dress.

Defendant is ORDERED to submit documentation in support of the amounts sought for attorney's fees and for accounting of profits no later than September 26, 1986. Plaintiff may respond no later than October 10, 1986.