**NEW YORK STOCK EXCHANGE, INC., Plaintiff,**

v.

**NEW YORK, NEW YORK HOTEL, LLC and New York, New York Hotel & Casino, LLC, Defendants.**

**No. 97 Civ. 2859(MGC).**

United States District Court, S.D. New York.

Sept. 30, 1999.

Baker & Botts, L.L.P., New York City, by Doreen L. Costa, Joseph D. Garon, Paul J. Reilly, for plaintiff.

Kelley, Drye & Warren, L.L.P., New York City, by William Golden, Jr., for plaintiff.

Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, by Kenneth A. Plevan, Bruce J. Goldner, Scott Brown, for defendants.

Quirk & Tratos, Las Vegas, Nevada, by Mark G. Tratos, Bradley L. Booke, Michael McCue, for defendants.

## OPINION

CEDARBAUM, District Judge.

Defendant New York, New York Hotel & Casino, LLC (the "Casino"), the corporate successor to defendant New York, New York Hotel, LLC, operates a hotel and casino in Las Vegas that has as its theme New York City. Among the references to New York City, the Casino features a large replica facade of the New York Stock Exchange building, which appears on the Casino floor, and a players club called "New York $lot Exchange." Plaintiff New York Stock Exchange, Inc. ("NYSE") objects to these uses, claiming that they constitute trademark infringement and unfair competition, trademark dilution, and false advertising under the Lanham Act. The NYSE asserts essentially the same claims under New York law. The Casino moves for summary judgment dismissing all of the NYSE's claims. For the reasons set forth below, the Casino's motion is granted.

## UNDISPUTED FACTS

### I.  The NYSE and its Marks

The NYSE is a not-for-profit corporation that is principally engaged in the busi-

ness of operating a market for the trading of securities issued by listed entities. The NYSE has been located in the same building, on Broad Street in lower Manhattan, since 1903. (Zito Aff. ¶ 4C.) Across the building's facade are six Corinthian columns, and at the pediment above the columns is a bas-relief sculpture designed by John Quincy Adams Ward and Paul Bartlett. (Reilly Decl.Ex. 12.)

The NYSE's service marks "New York Stock Exchange" and "NYSE" were registered on the Principal Register of the United States Patent and Trademark Office in 1971 for conducting a securities exchange and providing other related services. (Zito Decl.Exs. 1A and 1B.) The registrations show the year 1863 as the marks' first use. (Id.) The NYSE also obtained registration of a stylized form of "NYSE," in which all of the letters except the letter "S" have thin horizontal slots running through them. (Id. Ex. 1D.) Finally, the NYSE registered a two-dimensional representation of its building facade with the words "NEW YORK STOCK EXCHANGE" located beneath the facade's pediment. (Id. Ex. 1C.) [1] That mark was registered as a service mark on the Principal Register in 1993.

The NYSE regularly places advertisements in business magazines and newspapers, and has spent more than $61 million to advertise its services during the period 1988 to 1997. (Zito Decl. ¶ 10.) The NYSE's advertising budget for 1998 was approximately $15 million. (Id. ¶ 12.) In its advertisements, the NYSE sometimes uses the slogan: "The world puts its stock in us." (E.g., id. Ex. 16.) The NYSE's Internet site includes information on how the NYSE is regulated (under the heading "Protecting the Markets") and how a person can become an "educated investor." (Id. Ex. 4.) Under the heading "Putting Your Money to Work," the site explains

several options for a person who wishes to invest his money. It states: "If you've worked hard to save up some extra cash, you'd probably like a safe place to store it." (Id.)

The NYSE uses some of its marks on souvenir items such as t-shirts, desktop items and umbrellas that are given away or sold by the NYSE at its Interactive Education Center or at two hotel gift shops in New York City. (Payton Decl. ¶¶ 4, 7.) For the period 1987 to 1997, the NYSE had total revenues of more than $10 million from sales of items bearing one or more of the NYSE marks. (Id. ¶ 6.)

The NYSE's Senior Vice President for Communications testified by declaration that "numerous" companies "regularly request permission from" the NYSE to use its marks, and that the NYSE "carefully reviews and analyzes each such request ... to determine whether the proposed use is consistent with the [NYSE's] goals and the values the Marks represent." (Zito Decl. ¶¶ 27, 28.) The NYSE proffers various cease-and-desist letters that it has sent to object to unauthorized uses of the NYSE marks, including the facade. (Zito Decl. ¶ 32 & Ex. 14.) One such letter, dated October 6, 1997, objected to a newspaper advertisement for a floating casino in Brooklyn which prominently used the words "NEW YORK SLOT EXCHANGE." (Id. Ex. 14(G).)

## II. The Casino

The Casino opened for business on January 3, 1997. The Casino's exterior mimics features of the Manhattan skyline, with replicas of several famous buildings including the Empire State Building and the Chrysler Building. (Def.Ex.A.) The exterior includes replicas of other New York

---

1. The registration certificate shows the mark as a two-dimensional line drawing of the facade with the words "NEW YORK STOCK EXCHANGE" appearing below the pediment. The certificate states: "No claim is made to the exclusive right to use 'Stock Exchange' apart from the mark as shown. The mark consists of a representation of an actual building facade with the wording 'NEW YORK STOCK EXCHANGE' located beneath the pediment."

landmarks such as the Statue of Liberty and the Ellis Island immigration station.

Other "theme" hotels and casinos in Las Vegas include Rio (theme of Rio de Janeiro), The Orleans (theme of New Orleans) and Caesar's Palace (theme of ancient Rome). (Moore Aff. ¶ 7.)

Rooms and common areas in the Casino are named after famous New York City neighborhoods or landmarks, such as the "Coney Island Emporium" (a game arcade), "Soho Village" and "Park Avenue" (retail shops), the "Financial District" (casino cashier cages) and "Greenwich Village" (food court area). (Moore Aff. ¶ 17.) Numerous interior wall scenes show Manhattan neighborhoods and buildings, complete with street and subway signs to direct patrons to various areas of the Casino, as well as parking meters and steaming manhole covers. (*Id.* ¶ 21.)

The Casino's primary logo consists of its name ("New York New York Hotel & Casino") surrounding a picture of the Statue of Liberty. (Def.Ex.G.) A stylized image of the Statue of Liberty, in the pose of a showgirl, is used by the Casino on the gaming floor and in promotional materials, often with the slogan "With Luck and Liberty for All." (Def.Ex. B; Moore Aff. ¶ 28.) The Casino's Coney Island arcade includes such games as "Wac–A–Mayor," in which contestants try to slam the heads of former New York City mayors with large mallets, and a ring-toss game called the "Great New York New York Bottleneck." (Moore Aff. ¶ 29.)

In 1997, its first year of operation, 15 million people entered the Casino. (Moore Dep. 120.)

## III. Challenged Uses

*The Facade.* On the back wall of the "Financial District" kiosk, where the cashiers are located, is a large replica of the facade of the NYSE building. The words "NEW YORK NEW YORK SLOT EXCHANGE" appear on the replica in place of the words "NEW YORK STOCK EXCHANGE." (Moore Aff. ¶ 30.) When the Casino first opened in January 1997, the replica facade bore the name "NEW YORK NEW YORK STOCK EXCHANGE." The Casino changed the name after it received complaints from the NYSE. (Sherlock Dep. 32–33; Primm Dep. 56–57; Moore Dep. 37–38.) The replica facade is visible from one portion of the Casino's floor where slot machines are located.

A photograph of the replica facade was included in a Casino press kit distributed at the time of its opening. (Moore Dep. 67–68.) Approximately 600 such press kits were distributed. (Reilly Decl.Ex. 1 ¶ 43.) Photographs of the replica facade, including the photograph distributed by the Casino, appeared in newspapers nationwide. (Reilly Decl.Ex. 1 ¶ 44.) There is no evidence that the Casino has used pictures of the replica facade on its Internet site or on any merchandise.

*The Players Club.* The Casino sponsors a players club for regular users of the Casino's slot machines and other gaming activities. The initial name of the players club was "New York $lot Exchange," and members were issued cards bearing this name. After the NYSE complained, the Casino changed the name of the players club to "New York New York $lot Exchange." (Primm Dep. 60–61.) The Casino has used the old and the new forms of the name on marketing materials. (Def.Ex. C; Perry Dep. 34; Reilly Decl. Ex. 1 ¶ 60.) Each of the Casino's slot machines has a panel with the words "New York $lot Exchange," indicating where players club members should insert their membership cards. (Reilly Ex. 1 ¶ 54; *see also* 3/4/99 Tr. 51, 67, 95.) In addition, the Casino has used "NY$E" and "NY–NY$E" in some of its advertising. (Reilly Decl. Ex. 78; Moore Aff. ¶ 33.) At oral argument, the Casino's counsel represented that the Casino will not use any form of the "NY$E" mark in the future. (3/4/99 Tr. 94.)

A promotional brochure and registration form for the players club includes the slogan: "NEW YORK $LOT EXCHANGE:

Where Dividends are Paid Daily." (Def.Ex. C.) The brochure also juxtaposes the name "New York $lot Exchange" above the image of the Statue of Liberty as a showgirl, and the words "With Liberty and Luck for All." (*Id.*)

The Casino sends promotional materials for the players club to past Casino guests and patrons as well as residents of Las Vegas. (Reilly Decl.Ex. 1 ¶ 58.) The Casino maintains an interactive site on the Internet, through which it promotes the services of the Casino and solicits enrollment in the players club. A person may register to become a member of the players club through the site. (*Id.* ¶ 59.) After the first year of the Casino's operation, there were over 250,000 active members of the players club to whom membership cards were issued bearing the designation "New York $lot Exchange." (*Id.* ¶ 53.)

The Casino has used "New York $lot Exchange" or "New York New York $lot Exchange" on merchandise such as t-shirts, hats and gloves that are given by the Casino to members of the players club. (Perry Dep. 34; Reilly Decl.Ex. 1 ¶ 60.) None of this merchandise is offered for sale. (Busch Dep. 50.)

The Casino filed a federal service mark application for "New York $lot Exchange" for casino services in October of 1996. (Def.Ex.Y.) The United States Patent and Trademark Office reviewed the application and approved it for publication.[2] (Def.Ex.Z.)

### IV. Diversity of Citizenship

The NYSE is a not-for-profit corporation organized under New York law. (Reilly Decl.Ex. 1 ¶ 1.) The Casino is a limited liability company organized under Nevada law. (*Id.* ¶ 33.)

## DISCUSSION

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993). Nonetheless, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

In an action for trademark infringement, summary judgment may be granted where the undisputed evidence would lead to only one conclusion as to whether confusion is likely. *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 478 (2d Cir.1996) (citing *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 580 (2d Cir.1991) and other cases). "[T]he application of . . . facts to the *Polaroid* test and likelihood of confusion analysis . . . . is a legal issue which [is] appropriate for the district court to resolve on summary judgment." *Lois Sportswear,*

---

2. The examining attorney of the Patent and Trademark Office wrote that the "applicant must disclaim the descriptive wording 'NEW YORK' apart from the mark as shown. The wording is merely descriptive because it de-

scribes the theme and/or decor of applicant's casinos, namely various sites of New York and, in this specific case, the New York Stock Exchange." (Def.Ex.Z.)

*U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 876 (2d Cir.1986).

## I. The Facade

■ As a threshold matter, the Casino argues that it cannot be sued over use of the NYSE facade because it is not a trademark use. Instead, the Casino argues, the replica facade is only a representation of a New York City building. This would be an interesting issue if the Casino did not use the mark "NEW YORK NEW YORK SLOT EXCHANGE" prominently on the replica facade, in place of "NEW YORK STOCK EXCHANGE." With the name change, however, the use of the facade is not merely descriptive. The words are the Casino's, and designate the source of the services associated with the replica facade as the Casino. Indeed, the Casino has applied to register "New York $lot Exchange" with the United States Patent and Trademark Office. The replica facade cannot be separated from the prominent placement of the Casino's mark on the replica facade.

## II. Trademark Infringement

The NYSE asserts claims for trademark infringement and unfair competition in violation of sections 32 and 43(a) of the Lanham Act, as well as New York common law.

■ A defendant is liable for trademark infringement under the Lanham Act if its mark is likely to confuse the relevant public into believing that its goods or services emanate from the plaintiff, or "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of [defendant] with [plaintiff], or as to the ... sponsorship[ ] or approval of [defendant's] goods, services, or commercial activities by [plaintiff]." 15 U.S.C. § 1125(a)(1)(A); *see* 15 U.S.C. § 1114; *Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 960 (2d Cir.1996); *Nikon Inc. v. Ikon Corp.,* 987 F.2d 91, 94 (2d Cir.1993). The parties agree that a claim of trademark infringe-

ment under state common law also requires a showing of likelihood of confusion.

■ To determine the likelihood of confusion posed by a challenged use, courts in this Circuit are guided by the eight factors articulated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961). These factors are: 1) the strength of plaintiff's mark; 2) the similarity of plaintiff's and defendant's marks; 3) the competitive proximity of the services; 4) the likelihood that plaintiff will "bridge the gap" and offer a service like defendant's; 5) actual confusion; 6) good faith on defendant's part; 7) the quality of defendant's service; and 8) the sophistication of buyers. *Estee Lauder Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1510 (2d Cir. 1997). No one of the *Polaroid* factors is dispositive, and the list is not exhaustive. *Id.* The analysis of the factors is not a mechanical process. *Id.*

### A. Application of the Polaroid Factors

■ *Strength of Plaintiff's Marks and Similarity of Parties' Marks.* It cannot be disputed that the NYSE's marks are strong. In the usual trademark case, this factor would favor the senior user. The more deeply a plaintiff's mark is embedded in the consumer's mind, the more likely it is that the defendant's mark will conjure up the image of the plaintiff's product or service instead of that of the junior user. *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 503 (2d Cir.1996). The presence of these elements does not, however, always lead to confusion. *Id.*

The similarity of the marks also does not necessarily suggest a likelihood of confusion. "Similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question." *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1133 (2d Cir. 1979), *overruled on other grounds, Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1043–44 (2d Cir.1992). The issue is whether the *impression* that the junior mark makes upon customers is

such that they are likely to believe the service is from or endorsed by the same source as the one they know under the senior mark. *Id.* at 1134. The setting in which a trademark is used affects its appearance and colors the impression conveyed by it. *Hormel,* 73 F.3d at 503; *Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785, 790 (E.D.N.Y.1983).

Here, the context of the use minimizes the likelihood of confusion that would otherwise be caused by the similarity of defendant's marks to plaintiff's famous marks. The theme of the Casino is New York, and it consists of slightly or whimsically modified versions of famous New York landmarks. The "New York Stock Exchange" mark is modified in a manner consistent with this theme: "slot" for "stock" is an obvious pun. The "NY$E" mark is a more subtle pun and therefore presents a closer case, but the Casino has represented that it no longer uses this mark. In any event, a reasonable customer seeing it in the context of the Casino, or an advertisement for the Casino, would probably notice the difference between the original and the Casino's version.

*Competitive Proximity of the Services.* One element of the Casino's use of the modified marks is to point, in a whimsical fashion, to the similarities between gambling and investing in securities. Nevertheless, the Casino and the NYSE do not compete directly, and they offer different services. This substantially reduces the likelihood that anyone would think that the NYSE is associated with the Casino's business or its use of the modified NYSE marks. In contrast, the Casino's sale of a product under a slightly modified version of a mark that is normally associated with the same type of product would be more likely to cause confusion (e.g., if the Casino sold frankfurters under the name "Nathan's Slot Dogs").

The NYSE argues that both parties distribute comparable souvenir items bearing their respective marks. The Casino's use of the marks "New York $lot Exchange" and "New York New York $lot Exchange"

on merchandise must be viewed in context. The Casino does not sell these items. They are distributed only to members of its players club. Customer impressions of these items thus derive from the Casino's primary use of the marks. In this case, the separation between the markets for securities and legal gambling carries over into the secondary merchandising market. *See Hormel,* 73 F.3d at 504. Moreover, there is no possibility that a customer would purchase the Casino's merchandise with the misimpression that it came from or was associated with the NYSE, because the Casino does not offer this merchandise for sale.

*Bridging the Gap.* The NYSE has shown no likelihood that it will "bridge the gap" and offer services like those of the Casino, or that an average customer could perceive such a likelihood. *See Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 963 (2d Cir.1996) (stating the rule). The NYSE has produced no evidence on this issue, and its Vice President for Media Relations testified that he is unaware of any plans of the NYSE to expand into the legal gambling business. (Adamonis Dep. 52–52.) In view of the NYSE's concern that the Casino's use of the NYSE marks may tarnish them, it would be surprising if the NYSE had such plans.

*Actual Confusion.* "If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 228 (2d Cir.1999).

The NYSE has proffered no evidence from which a reasonable finder of fact could conclude that the Casino's use of the marks has caused actual confusion. The NYSE did not conduct a consumer survey, but it points to two responses to a survey commissioned by the Casino. (Elsewhere,

the NYSE attacks the survey's design and argues that it is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). (Pl. 56.1 Stat. ¶ 133.)) Those two responses, from a total sample of 222, are not evidence of actual confusion. After viewing a Casino brochure that promotes the "New York $lot Exchange" players club, the two respondents stated that they initially thought that the brochure related to the NYSE. However, both respondents stated that upon reading the brochure, they realized that the brochure did not relate to the NYSE.[3] Moreover, even if these respondents were confused for a fleeting moment, the fact that only two of 222 respondents had such a response does not support a conclusion that an "appreciable number" of customers are likely to be confused. *See Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 253 (2d Cir.1982); *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1138 (2d Cir.1979).

The NYSE also points to two newspaper articles among the extensive press coverage of the Casino's opening. One article, appearing in a trade journal and concerning the Casino's computer network, referred to the "New York Stock Exchange Club."[4] This apparently was a mistaken reference to the players club, which was originally called the "New York $lot Exchange." However, in the context of the Casino's theme, which was discussed in the article, the reference is no more evidence of actual confusion than the article's references to the Coney Island roller coaster or the AT & T Building.

The other article, appearing in *The Orlando Sentinel*, contained the following passage:

"[T]here's the Empire State Building. Next to it is the famous glass-sheathed Lever House. And look! There's the Century Building, the New Yorker Hotel and the Art Deco Chrysler Building. And who's out front to greet everybody? A 150–foot–high Statue of Liberty."

"It's virtual New York and the hottest thing in Las Vegas."

"In its first month, this gigantic caricature of New York attracted more than a million visitors. Inside, in the shadow of a non-negotiable New York Stock Exchange, the crowds that come to gawk at this architectural tour de force are so thick one can hardly move from the 25–cent slots to the $1 machines."

(Reilly Decl.Ex. 43.) This article, which also notes that the Casino "smacks of a giant-sized practical joke," does not demonstrate that there was actual confusion. If anything, the article shows that it is not likely that a visitor to the Casino would be confused as to sponsorship or association.

*Defendant's Good Faith.* This factor concerns whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and any confusion between its and the plaintiff's services. *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 482–83 (2d Cir.1996).

Issues of good faith are generally ill-suited for disposition on summary judgment. *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir.1991). Nevertheless, there is no evidence that the Casino's intent was to confuse the public, and given the nature of the use, there is no basis to infer such an intent. The Casino does benefit from the fame of the NYSE's marks, just as it benefits from the fame of New York City and various of its other

---

**3.** One respondent stated: "Initially I thought it was something pertaining to the Stock Exchange until I read a little further." (Reilly Decl.Ex. 38 ¶ 3a.) The other respondent stated: "It struck me not as a casino at first and then I read it and realized it's not the N.Y. Stock Exchange." (*Id.* Ex. 39 ¶ 3a.)

**4.** "If [a person] joins the New York Stock Exchange Club, his name and driver's license information will be stored in the optical jukebox. As a club member, [he] receives a card that resembles a credit card. He can use the card at a slot machine or at a gaming table to accumulate points that he can redeem for cash prizes." (Reilly Decl.Ex. 43.)

landmarks. But the Casino does not benefit from the marks' fame by a message that its services emanate from or are associated with the NYSE, or even that its use of the modified marks is endorsed by the NYSE.

Like a parody, the Casino's theme depends upon association with the original, while also pointing out the differences. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 502 (2d Cir.1996) ("A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody.") (internal quotation marks omitted). For instance, the name of the players club, "New York [or New York New York] $lot Exchange," implicitly contrasts "stocks" with "slots" and suggests, in an irreverent way, that there may be similarities between the two. The slogan "Where Dividends are Paid Daily," which the Casino occasionally uses with its players club name, similarly analogizes and contrasts legal gambling and securities investing.

Plaintiff has not proffered evidence that the Casino's adoption of the modified versions of the NYSE's marks was done in bad faith.

*Sophistication of Customers.* In making a determination of likelihood of confusion, a court must assess the level of sophistication of the relevant customers. The touchstone is the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods. *Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 965 (2d Cir.1996). In this case, the level of sophistication in both the Casino's and the NYSE's markets vary widely. Nevertheless, because the Casino's theme and the pun on the NYSE's marks are obvious, even a minimally prudent customer would not be confused by the source or affiliation of the Casino's services. The purchasing public must be credited with at least a modicum of intelligence. *McGregor–Doni-*

*ger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1138 (2d Cir.1979).

*Quality of Defendant's Services.* The quality of a junior user's product or service can be relevant in two ways: (1) an inferior service may cause injury to the trademark because people may think that the services come from the same source, or (2) services of equal quality may tend to create confusion as to source because of this very similarity. *Hormel,* 73 F.3d at 505. The NYSE argues the former. It contends that the Casino's use of the marks is destructive of the NYSE's goodwill and reputation because the respective services are vastly different and convey divergent messages. *See Planned Parenthood Fed'n of America, Inc. v. Bucci,* 42 U.S.P.Q.2d 1430, 1439 (S.D.N.Y.1997). The NYSE asserts that its reputation as a stable, well-regulated market is damaged by the Casino's use of the marks.

This alleged injury might, under some circumstances, sustain an action for tarnishment. However, in the absence of a likelihood of confusion, the divergent message arguably conveyed by the Casino's use cannot sustain a claim of trademark infringement. As Justice Holmes observed:

"[A trademark] does not confer a right to prohibit the use of the word or words. It is not a copyright.... A trade-mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his. *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141.... When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth."

*Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731 (1924).

After applying the *Polaroid* factors, a reasonable trier of fact could not conclude that an appreciable number of customers would be confused into believing that the NYSE supplied, sponsored or approved of

the Casino's goods or services or the Casino's use of the NYSE's marks. The obvious pun in the variation of the marks, together with the difference in the services offered by the Casino and the NYSE, dispel the likelihood of confusion. *Cf. Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526 (5th Cir.1998). Moreover, this is not a case in which the defendant operates a casino with no theme, but nevertheless has a replica of the NYSE facade or uses the name "New York $lot Exchange" for its players club. Context is critical here.

NYSE's false advertising claim, that the Casino has made a false representation about sponsorship or endorsement, is essentially identical to its claim of trademark infringement. Accordingly, the same analysis applies, and summary judgment must also be granted on the NYSE's false advertising claim under federal and New York law.

## II. Dilution

I turn to plaintiff's real grievance in this action, dilution. The NYSE alleges dilution by blurring and tarnishment.

### A. Lanham Act

Trademark dilution is a relative newcomer to the Lanham Act. Section 43(c) of the Act, 15 U.S.C. § 1125(c), now entitles the "owner of a famous mark ...", subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." "Dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127.

. In determining whether a mark is "distinctive and famous," a court may consider "factors such as, but not limited to":

"(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."

15 U.S.C. § 1125(c)(1).

In *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208 (2d Cir.1999), the Second Circuit held that a necessary element of a claim of dilution under the Lanham Act is that the mark be "distinctive" in addition to being famous. *Id.* at 215. Writing for the court, Judge Leval stated that "A mark that, notwithstanding its fame, has no distinctiveness is lacking the very attribute that the antidilution statute seeks to protect." Judge Leval also noted that a "mark can be famous without being at all distinctive, as in the cases of American Airlines, American Tobacco Company, British Airways...." *Id.* at 227–28. By these examples, the court made clear that a famous mark that has acquired secondary meaning is not "distinctive" as that term is used in the federal antidilution statute, and is thus not entitled to protection thereunder. The Second Circuit has thus construed "distinctiveness" to be equivalent to what is sometimes referred to as "inherent distinctiveness" in trademark law. *See Two Pesos, Inc. v. Taco*

*Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ("An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning."); *Restatement (Third) of Unfair Competition* § 13 (1995) ("A word, name, symbol, device, or other designation, or a combination of such designations, is 'distinctive' ... if ... (b) the designation, although not 'inherently distinctive,' has become distinctive, in that, as a result of its use, prospective purchasers have come to perceive it as a designation that identifies goods, services, businesses, or members in the manner described in Subsection (a). Such acquired distinctiveness is commonly referred to as 'secondary meaning.' ").

The language of the statute does not distinguish between claims for dilution by blurring and dilution by tarnishment. The legislative history makes clear that Congress intended the antidilution statute to make dilution by tarnishment actionable as well: "The purpose of [the amendment] is to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it, even in the absence of a likelihood of confusion." H.R.Rep. No. 104–374, at 2, *reprinted in* U.S.C.C.A.N. at 1029, 1029 (1995). *See also NBA Properties v. Untertainment Records LLC,* No. 99 Civ. 2933, 1999 WL 335147, at **7–9 (S.D.N.Y. May 26, 1999) (granting motion for preliminary injunction under federal and state antidilution statutes because of likelihood of tarnishment).

Although *Nabisco* dealt only with dilution by blurring, the court did not limit its reading of the "distinctiveness" requirement to one type of claim under the antidilution statute. Accordingly, the requirement for "distinctiveness" as interpreted by the Second Circuit applies to the NYSE's claims of trademark dilution by blurring and tarnishment under the Lanham Act.

The mark "New York Stock Exchange" is a combination of the generic term "Stock Exchange" with the geographic term "New York." It is not "distinctive" as that concept is defined by the Second Circuit in *Nabisco*.[5]

The facade is also not "distinctive" under *Nabisco*. It is undisputed that many prominent buildings in the United States and elsewhere have classical facades with Corinthian columns and bas-relief figures on a pediment. (Def. & Pl. 56.1 Stat. ¶ 75.) These include the United States Supreme Court building, the Kings County Supreme Court building, New York County Supreme Court building and the Brooklyn Museum, (Def.Exs.P, S, T, V), as well as considerably older buildings such as the Parthenon.

There is no question that some parts of the facade are unique; the particular arrangement of the elements contained in the representation that the NYSE has registered, as well as the sculpture that appears on the pediment, differ from those in any other building. But as the Fifth Circuit has noted, uniqueness is insufficient by itself to justify a finding of distinctiveness. *Pebble Beach,* 155 F.3d at 541 n. 7. A suggestive mark or trade dress, in contrast to a descriptive or generic mark, requires the consumer "to exercise the imagination in order to draw a conclusion as to the nature of the goods and services." *Id.* at 540. The mark claimed and registered by the NYSE consists of a picture of the facade of its building together with the words "NEW YORK STOCK EXCHANGE" located below the building's pediment. The combination of a classical facade that is regularly used for buildings containing public spaces and the words "NEW YORK STOCK EXCHANGE" as part of the facade does not require a person to exercise imagination to realize that the building houses a stock exchange. The facade therefore is not "distinctive" as that

---

**5.** It is unnecessary to determine whether the "NYSE" mark is sufficiently distinctive be-

cause the Casino has represented that it will not use the "NY$E" mark in the future.

concept is defined by the Second Circuit in *Nabisco.*

Accordingly, the NYSE cannot succeed on a claim for dilution under the Lanham Act.

## B. New York Law

Section 360–1 of the New York General Business Law provides: "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark ... or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y.Gen.Bus.Law § 360–1 (McKinney 1996 & 1999).[6] Courts have interpreted the statute, commonly known as the New York antidilution statute, as creating a claim for dilution by blurring and a claim for tarnishment. *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 506 (2d Cir.1996).

It is undisputed that the NYSE's marks at issue have acquired secondary meaning, and therefore are entitled to protection under the New York antidilution statute. *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 42 (2d Cir.1994) (a plaintiff bringing a claim under New York law must show that its trademark is of "truly distinctive quality" or has acquired secondary meaning).

## 1. Blurring

In order to establish dilution by blurring, a plaintiff must establish that the challenged use will dilute the "distinctive quality of a mark or trade name." N.Y.Gen.Bus.Law § 360–1 (McKinney 1996 & 1999). Blurring occurs "where the defendant uses the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's services." *Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 966 (2d Cir.1996)

(internal quotation marks omitted). It has typically involved "the whittling away of an established trademark's selling power through its unauthorized use by others upon dissimilar products." *Deere,* 41 F.3d at 43 (describing such "hypothetical anomalies" as "DuPont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, [and] Bulova gowns") (quoting legislative history of New York antidilution statute). Blurring requires that the challenged use risks impairing the identification of plaintiff's marks with its products or services. *Id.* at 44.

Here, the NYSE has failed to show such a risk. The challenged uses are not subtle references to the NYSE. In the context of the Casino's theme, it is clear that the challenged marks explicitly refer to the NYSE, and their success depends on a customer making a connection with the original marks. In this sense, the Casino's use of the marks is like a parody or another type of joking reference. The challenged marks are partially nominative because their subjects are the original marks, and the challenged marks' effectiveness requires the Casino customer to connect them to the original marks. Such a use may even increase the public identification of the NYSE's marks with the NYSE. *See Hormel,* 73 F.3d at 506; *see also Yankee Publishing Inc. v. News America Publishing Inc.,* 809 F.Supp. 267, 282 (S.D.N.Y.1992) (" 'the use of famous marks in parodies causes no loss of distinctiveness, since the success of the use depends upon the continued association of the mark with the plaintiff' ") (quoting Robert C. Denicolo, "Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols," 1982 *Wis.L.Rev.* 158, 188).

Similarly, the differences in the marks and the differences in the services diminish the possibility that the selling power of the original marks will be diluted. *Hor-*

---

**6.** This statute was previously codified at N.Y.Gen.Bus.Law § 368–d.

*mel,* 73 F.3d at 506; *Mead Data,* 875 F.2d at 1030, 1036.

It is the difference in the underlying services together with the partially nominative use of the marks that distinguish this case from those relied on by the NYSE. *See Sports Authority, supra; Lexington Management Corp. v. Lexington Capital Partners,* 10 F.Supp.2d 271 (S.D.N.Y.1998); *Clinique Laboratories, Inc. v. Dep Corp.,* 945 F.Supp. 547 (S.D.N.Y.1996); *WAWA Dairy Farms v. Haaf,* 40 U.S.P.Q.2d 1629 (E.D.Pa.1996), *aff'd,* 116 F.3d 471 (3rd Cir.1997); *Pebble Beach Co. v. Tour 18 I Ltd.,* 155 F.3d 526 (5th Cir.1998).

Given the nature and context of the Casino's use of the marks, a reasonable finder of fact could not conclude that the challenged uses are likely to lessen the ability of the NYSE marks to serve as unique identifiers of the NYSE's services.

*2. Tarnishment*

▇ While cases generally have not specified the particular language in the New York "antidilution" statute that makes tarnishment actionable, a claim of tarnishment is better understood as arising from a "[l]ikelihood of injury to business reputation" rather than from a likelihood of "dilution of the distinctive quality of a mark." Tarnishment "generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Deere,* 41 F.3d at 43. The essence of tarnishment therefore is not a dilution or reduction in the distinctiveness of a mark. It is instead the displacement of positive with negative associations of the mark that, like a claim for

blurring, reduces the value of the mark to the trademark owner. *Restatement (Third) of Unfair Competition* § 25 cmt. c (1995); *see also* United States Trademark Ass'n Trademark Review Comm'n Report and Recommendations to USTA President and Board of Directors, 77 *Trademark Rep.* 375, 434 (1987) ("Although tarnishment can dilute trademark distinctiveness, the typical injury is less dilution than injury to reputation.").

"The *sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods,* 73 F.3d at 507. To prove a case of tarnishment, the prior user must demonstrate that the use is likely to undermine or damage the positive associations evoked by the mark. *Restatement* § 25 cmt. g.

The NYSE complains that the Casino has "associate[d] the Exchange's Marks with casino gambling." (Pl.Mem. at 13.) It also complains that the Casino has equated gambling and "investing," and further asserts that the "accused uses by the Casino place the Exchange in an extremely negative light and create an impression which is completely at odds with the image of dependability, quality, regulation and prestige the Exchange has striven to maintain." (*Id.* at 12, 13.)

There is little doubt that the challenged marks are likely to bring to mind the NYSE and its marks. The variations between the challenged marks and the senior, famous marks are not substantial, especially in the case of the replica facade, and one of the Casino's admitted purposes in using the challenged marks is to refer to the NYSE.[7]

---

**7.** The NYSE points to evidence that customers have in fact made such connection, in the form of answers to the Casino survey that the NYSE argues elsewhere is inadmissible. After being shown a promotional brochure for the "New York $lot Exchange" players club, respondents were asked a series of questions, including: "Other than the business or service being advertised in the brochure, did any other company, business, or kind of business or industry come to mind when you read the brochure?" Among the 222 participants in the survey, 14 answered that the New York Stock Exchange came to mind. Six respondents stated that the "stock exchange" came to mind. (Def.Ex. II Tables 3 and 5; Reilly Decl.Ex. 40 at 220.)

The fact that a visitor to a casino in Las Vegas is likely to understand that the challenged uses refer to the NYSE's marks is not sufficient to sustain a claim for tarnishment. The NYSE is not likely to suffer injury to its business reputation merely because customers or potential customers of the Casino make a mental connection at the time they view the challenged marks. Moreover, the NYSE itself has associated its marks with casinos. To commemorate the NYSE listing of securities issued by Rio Hotel & Casino, Inc. in 1996, the NYSE ran an advertisement in the *Wall Street Journal* that superimposed an outline of a slot machine on a stock quotation listing. This appeared above the NYSE's name and logo. (Def.Ex.FF.) A copy of the advertisement is attached to this Opinion as Appendix A. Securities of approximately 20 corporations that offer gaming services are listed and traded on the New York Stock Exchange, including MGM Grand, Inc., a 50–percent owner of the Casino. (Def. & Pl. 56.1 Stat. ¶¶ 107, 108.) In *Eastman Kodak Co. v. Rakow,* 739 F.Supp. 116 (W.D.N.Y.1989), where defendant comedian used an unmodified version of plaintiff's highly distinctive mark in his act and promotional materials that included crude, off-color humor, the court emphasized that Eastman Kodak had an established corporate policy against sponsoring programs involving violence and sexual themes.

The NYSE has not shown that it has publicly opposed legal gambling or that legal gambling is so unwholesome or scandalous that any association with it can sustain a claim for tarnishment. *Cf. id.; Toys "R" Us, Inc. v. Akkaoui,* 40 U.S.P.Q.2d 1836, 1838, 1996 WL 772709 (N.D.Cal.1996) (in case where dilution under federal antidilution statute was undisputed, court stated that " 'Adults R Us' tarnishes the 'R Us' family of marks by associating them with a line of sexual products that are inconsistent with the image Toys 'R' Us [a children's toy store] has striven to maintain for itself").

To succeed on its tarnishment claim, the NYSE must show a likelihood that the positive associations that the NYSE has developed for its marks will be replaced by negative associations as a result of the Casino's use. It must show that the Casino's use of the marks is likely to cause reasonably intelligent visitors to the Casino or the Casino's Internet site to believe, or to believe to a greater extent than they previously did, that gambling is similar to investing in securities traded on the NYSE.

The NYSE has failed to make such a showing, despite the fact that the Casino has been using the challenged marks since January of 1997 and discovery has been completed. The NYSE has not proffered any circumstantial or direct evidence, either lay or expert, showing that positive associations that the NYSE has developed for its marks are likely to be replaced by negative associations because of the Casino's "New York $lot Exchange." *See Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785, 794 (E.D.N.Y.1983).

The only evidence that the NYSE proffers are two newspaper photograph captions that appeared in articles relating to the Casino.[8] The captions appeared under a photograph of the replica facade with slot machines in the foreground. One read: "Well, the stock exchange is kind of a gamble, too." (Reilly Decl.Ex. 66.) The other read: "Gamblers can hope their stocks rise while making a high-risk investment at the slots at New York–New York in Las Vegas." (*Id.* Ex. 67.)

The fact that a newspaper reporter understood the joking comparison between a stock exchange and a casino does not show that the challenged uses are likely to tarnish the NYSE's marks or otherwise cause injury to the NYSE's business reputation. This evidence does not provide a sufficient

---

**8.** The record does not show the names of the two newspapers that published the photo-graph captions.

basis on which a finder of fact could reasonably conclude that the public's impression of the NYSE is likely to be affected negatively as a result of seeing "New York $lot Exchange" in its context.

The case that the NYSE relies on most heavily is *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39 (2d Cir.1994). That case involved comparative advertising by a competitor, a sensitive area in the law of unfair competition. A competitor had animated and distorted plaintiff's deer logo in an advertisement comparing plaintiff's and defendant's products, portraying plaintiff's logo, a "graceful, full-size deer—symbolizing Deere's substance and strength—", as a "deer that appears smaller than a small dog ... [that] scampers away from the dog and a lawn tractor, looking over its shoulder in apparent fear." The Second Circuit held that defendant's use was actionable under New York's antidilution statute. In that case, defendant was a competitor that was denigrating the mark for the "sole purpose of promoting a competing product." The NYSE and the Casino are not competitors.

In four of the six other cases on which the NYSE relies, the courts first found a likelihood of confusion between defendants' infringing marks and plaintiffs' senior marks before holding that there had been tarnishment. *See Chemical Corp. of America v. Anheuser–Busch, Inc.*, 306 F.2d 433 (5th Cir.1962); *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*, 642 F.Supp. 1031 (N.D.Ga. 1986); *Steinway & Sons v. Robert Demars & Friends*, 210 U.S.P.Q. 954 (C.D.Cal. 1981); *Grey v. Campbell Soup Co.*, 650 F.Supp. 1166 (C.D.Cal.1986). While actual confusion is not necessary for a showing of tarnishment, it is a very strong indicator of likelihood of tarnishment if the infringing use is unsavory or otherwise carries a negative association. *See generally Nabisco*, 191 F.3d at 220–21 (actual confusion can be "highly probative of dilution"). There has been no showing of a likelihood of confusion in this case.

The two other cases on which the NYSE relies are also inapposite. *In Anheuser–Busch Inc. v. Andy's Sportswear Inc.*, 40 U.S.P.Q.2d 1542 (N.D.Cal.1996)DISTINGUISHING, the court granted plaintiff Budweiser's application for a temporary restraining order enjoining defendant from distributing its "Buttwiser" t-shirts. The one-page opinion contains no discussion of the facts in that case, and no analysis other than the statement that the plaintiff "has raised serious questions with respect to whether defendant's t-shirts will 'dilute' these marks" under the federal antidilution statute. Accordingly, no applicable principle can be discerned from this case. In *Toys "R" Us Inc. v. Akkaoui*, 40 U.S.P.Q.2d 1836, 1996 WL 772709 (N.D.Cal.1996)DISTINGUISHING, the only disputed issue was whether defendants were still engaging in the challenged conduct; defendants did not contest that their use of the mark amounted to dilution under the federal statute. Nonetheless, the court stated that defendants' use of the mark 'Adults R Us' tarnished the 'R Us' family of marks by associating them with a line of sexual products that are inconsistent with the image that plaintiff Toys 'R' Us, a children's toy store, had striven to maintain for itself. *Id.* at 1838.

This case also differs from the cases on which the NYSE relies because it involves some degree of satiric expression by a non-competitor. One element of the Casino's use is a commentary on similarities between a casino and a stock exchange. The fact that the Casino is using the marks to promote its services, and is using the modified marks as its own trademarks, decreases the significance of this factor. *Cf. Yankee Publishing*, 809 F.Supp. at 275–82; *see also Deere*, 41 F.3d at 45 ("The line-drawing in this area becomes especially difficult when a mark is parodied for the dual purposes of making a satiric comment and selling a somewhat competing product."). Nonetheless, the expressive content of the use distinguishes this case from cases where the defendant has appropriated the name solely to capi-

talize on the recognition of the senior user's mark. *See, e.g., Steinway & Sons, supra* (use of "Stein-way" for clip-on handles); *Grey v. Campbell Soup Co., supra* (selling dog bones under the "DOGIVA" name).

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety.

SO ORDERED.

## APPENDIX A

On January 11, 1996
Rio Hotel & Casino, Inc. (RHC)
listed on the New York Stock Exchange.

Rio Hotel & Casino, Inc., owner and operator of the country's only all-suite hotel and casino, the Rio Suite Hotel & Casino in Las Vegas, Nevada, joins the largest equity market in the world, the New York Stock Exchange, where more capital is raised than in all other U.S. equity markets combined.

The world puts its stock in us."