TOMMY HILFIGER LICENSING,
INC., Plaintiff,

v.

NATURE LABS, LLC, Defendant.

No. 99 CIV.10713(MBM).

United States District Court,
S.D. New York.

Aug. 13, 2002.

**412**

Louis S. Ederer, Esq., Joseph H. Lessem, Esq., Gursky & Ederer, New York City, for Plaintiff.

Robert Mason, Esq., Mason & Petruzzi, Dallas, TX, Adam D. Cole. Esq., Greenberg Traurig, New York City, for Defendant.

## OPINION & ORDER

MUKASEY, District Judge.

Defendant Nature Labs, LLC manufactures, markets and sells a line of pet perfumes whose names parody elegant brands sold for human consumption—Timmy Holedigger (Tommy Hilfiger), CK–9 (Calvin Klein's cK–1), Pucci (Gucci), Bono Sports (Ralph Lauren's Polo Sports), Miss Claybone (Liz Claiborne), and White Dalmations (Elizabeth Taylor's White Diamonds). Most of the companies that purvey these expensive human fragrances have chosen either to accept the implied compliment in this parody—that the mere association of their high-end brand names with a product for animals is enough to raise a smile—or, if they have taken offense, to suffer in silence. Not so plaintiff Tommy Hilfiger Licensing, Inc., which sues for trademark infringement, trademark dilution, false designation of origin, false advertising, and related claims under New York statutory and common law. Defendant moves for summary judgment. For the reasons stated below, defendant's motion is granted.

### I.

The following facts are not in dispute. Tommy Hilfiger Licensing, Inc. ("Hilfiger") is the owner of the world-famous TOMMY HILFIGER and flag design trademarks used in connection with the sale of numerous high-end products, including fragrances. (Compl. ¶ 9) The flag design mark is comprised of a combination of red, white, and blue geometric shapes. (*Id.* ¶ 8) These marks are federally registered, and several of those registrations have achieved incontestable status pursuant to 15 U.S.C. § 1065. (*Id.* ¶ 10)

In 1995, Nature Labs began developing its line of parody perfume products for use on pets. (Harris Dep. at 14; Pl. 56.1 ¶ 1; Def. 56.1 ¶ 1) Nature Labs' initial spoof of Hilfiger was called Tommy Holedigger and had a flag-shaped label with side-by-side

red and white squares bordered on top and bottom by a blue stripe with white letters. Hilfiger complained that this use infringed its marks. Nature Labs then changed the name to Timmy Holedigger and changed the label to its present form: inverted side-by-side yellow and red triangles bordered on top and bottom by a blue stripe with white letters.[1] Beneath the new logo design, the following phrase appears: "If You Like Tommy Hilfiger Your Pet Will Love Timmy Holedigger." Although neither party claims to have performed a disciplined olfactory comparison or chemical analysis, John Harris, the general partner of Nature Labs, testified at his deposition that the two scents are similar, based on his recollection of Hilfiger cologne. An asterisk following the words "Tommy Hilfiger" references a disclaimer in red type on the back label, which states, "This imitation fragrance is not related to Tommy Hilfiger Licensing, Inc." (Pl. 56.1 ¶ 7; Def. 56.1 ¶ 7; Lessem Decl. Ex. B; Harris Dep. at 56, 105–06) Another current version of the product, a two-ounce bottle being marketed primarily to PetCo, changes the flag-shape label to a bone with red and yellow triangles and a thick blue border. (Harris Dep. at 74; Lessem Decl. Ex. E) Hilfiger persists that these uses constitute unlawful use of its trademarks.

As noted, Nature Labs' line of animal perfume includes parodies of several designer fragrances. (Pl. 56.1 ¶ 2; Def. 56.1 ¶ 2) All the parody pet colognes are packaged in the same type of bottle, and Nature Labs' resellers stock at least three and often more of the pet colognes, displaying them next to one another. (Id. ¶ 3) The displays Nature Labs provides to its retailers are labeled "famous pet cologne"; some also include the slogan "Strong enough for a man, but made for a chihuahua." (Lessem Decl. Exs. D, E) Nature Labs sells its products primarily to pet stores and gift shops, where they retail at approximately $10.00 per four-ounce bottle. (Harris. Dep. at 41, 44). No company other than Tommy Hilfiger has complained to Nature Labs that Nature Labs is inappropriately using its marks. (Pl. 56.1 ¶ 4; Def. 56.1 ¶ 4)

II.

Plaintiff's complaint sets forth six categories of claims: (1) trademark infringement under section 32 of the Lanham Act, 15 U.S.C. § 1114, and New York common law; (2) false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) unfair competition under New York common law; (4) trademark dilution under section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and New York General Business Law § 360–l; (5) false advertising under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and (6) deceptive business practices under New York General Business Law § 349.[2]

---

1. In its 56.1 statement, Hilfiger appears to dispute that it complained to Nature Labs, but the deposition it submits cites this suit as the reason for the label change. (Harris Dep. at 34)

2. This last claim appears to rely on plaintiff's allegations of trademark infringement and false designation of origin. (Compl.¶ 44) Some courts have allowed such an application of section 349, but the majority have held that trademark cases are outside the scope of this general consumer protection statute. See R. Givens, Practice Commentaries on N.Y. Gen. Bus. Law § 349 (McKinney 1988). Compare Steinway, Inc. v. Ashley, 2002 WL 122929, at *2 (S.D.N.Y. Jan. 29, 2002), with U–Neek, Inc. v. Wal–Mart Stores, Inc., 147 F.Supp.2d 158, 176 (S.D.N.Y.2001), and La Cibeles, Inc. v. Adipar, Ltd., 2000 WL 1253240, at *15 (S.D.N.Y. Sept. 1, 2000). Plaintiff's invocation of the statute may also rely on allegations of false advertising, which are more relevant to consumer interests— although again, the statute's applicability to all comparative advertising claims is debatable. See Givens, supra. In any case, the analysis would mirror that of the related fed-

A. *Trademark Infringement, False Designation of Origin, and Unfair Competition*

The central issue in an action for trademark infringement or false designation of origin under the Lanham Act is whether the unauthorized use of the mark is "likely to cause confusion." 15 U.S.C. § 1114(1); 15 U.S.C. § 1125(a)(1)(A). Confusion exists where there is a "likelihood that an appreciable number of ordinary prudent purchasers" will be misled or confused as to the source of the goods in question, *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), or where consumers are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark, *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir.1979). The court's conclusion as to whether there is a likelihood of confusion also determines plaintiff's common-law trademark infringement and unfair competition claims. *See Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581, 584–85 (2d Cir.1990).

■ Hilfiger contends that defendant's use of the Tommy/Timmy Holedigger name [3] and flag design is likely to cause confusion in the marketplace. Nature Labs appears to defend on two grounds: First, it asserts that there is no likelihood of confusion because the use constitutes an obvious parody. Second, it argues that even if there were some confusion, trademark parodies are a protected form of expression under the First Amendment.

Turning first to the second defense—upon which Nature Labs principally re-

lies—the Second Circuit has recognized that where the unauthorized use of a trademark is part of an expressive work, such as a parody, the Lanham Act must be construed narrowly. *Harley–Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 813 n. 14 (2d Cir.1999) (quoting Restatement (Third) of Unfair Competition § 25 cmt. i (1995)). Specifically, it has held that the public interest in avoiding consumer confusion must be balanced against the public interest in free speech. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g*, 886 F.2d 490, 494 (2d Cir.1989). Cases finding that First Amendment interests prevail involve nontrademark uses of mark—that is, where the trademark is not being used to indicate the source or origin of consumer products, but rather is being used only to comment upon and, in the case of parody, to ridicule, the trademark owner. *See, e.g., id.; Charles Atlas, Ltd., v. DC Comics, Inc.*, 112 F.Supp.2d 330 (S.D.N.Y. 2000); *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F.Supp. 267 (S.D.N.Y. 1992). In such cases, the parodist is not trading on the good will of the trademark owner to market its own goods; rather, the parodist's sole purpose for using the mark is the parody itself, and precisely for that reason, the risk of consumer confusion is at its lowest. *See id.*

The balancing test adopted by the Second Circuit thus takes into account the purpose behind trademark law, and "allows greater latitude for works such as parodies, in which expression, and not commercial exploitation of another's trademark, is the primary intent, and in which there is a need to evoke the original work

eral claim, so no separate discussion is necessary. *See Steinway, Inc.*, 2002 WL 122929, at *2; *Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 588 F.Supp. 1082, 1083 n. 4 (S.D.N.Y.), *aff'd* 747 F.2d 114 (2d Cir.1984).

3. Nature Labs asserts that because it is no longer marketing a product with the Tommy Holedigger label and has agreed not to do so in the future, Hilfiger's claims against the early design should be dismissed at moot. However, because Hilfiger seeks an accounting of profits, the issue is not moot.

being parodied." *Cliffs Notes,* 886 F.2d at 495.

Hilfiger argues that Nature Labs is not entitled to any consideration under the First Amendment because, first, its product admittedly makes no comment about Hilfiger, and second, the use of the mark as a source identifier on the pet perfume is a trademark use of the mark. Hilfiger points out that when asked at his deposition whether his product was intended to make any comment about Hilfiger, Hilfiger products, or Hilfiger customers, John Harris, the general partner of Nature Labs, said no. (Harris Dep. at 36–37) Harris did, however, testify that he was intending to create a "parody . . . target[ing] . . . Tommy Hilfiger," "a fun play on words," or "spoof . . . [t]o create enjoyment, a lighter side." (*Id.* at 30–31, 36) Although Harris had difficulty expressing the parodic content of his communicative message, courts have explained that:

> Trademark parodies . . . do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we are free to laugh at the images and associations linked with the mark. The message also may be a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner.

See *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 34 (1st Cir.1987); *see also Anheuser–Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 321 (4th Cir.1992)(quoting *id.*). One can readily see why high-end fashion brands would be ripe targets for such mockery, and why pet perfume is a clever vehicle for it. Even if not technically a parody, Nature Labs' use is at least a pun or comical expression— ideas also held to be entitled to First Amendment protection. *See Yankee Publ'g,* 809 F.Supp. 267, 279 n. 11; *Charles Atlas,* 112 F.Supp.2d at 337–38 & n. 11.

■ Hilfiger's second contention, however, merits more attention, for it is clear that when another's mark is used for source identification in a way likely to cause consumer confusion, it is actionable under the Lanham Act. *See, e.g., Harley–Davidson,* 164 F.3d at 812. The First Amendment affords no protection because trademark law permissibly regulates misleading commercial speech. *See Yankee Publ'g,* 809 F.Supp. at 276. *See generally* Robert C. Denicola, *Trademarks as Speech,* 1982 Wisc. L.Rev. 158; Note, *Trademark Parody,* 72 Va. L.Rev. 1079 (1986). In this case, Nature Labs arguably uses an adaptation of the Hilfiger mark for the dual purpose of making an expressive comment and selling a noncompeting product, an area where it has been noted that line-drawing becomes rather difficult. *See Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 45 (2d Cir. 1994); *N.Y. Stock Exch. v. New York, New York Hotel, LLC,* 69 F.Supp.2d 479, 493–94 (S.D.N.Y.1999), *aff'd in part and rev'd in part,* 293 F.3d 550 (2d Cir.2002). However, because the mark is being used at least in part to promote a somewhat non-expressive,[4] commercial product, the First

---

4. Commentators have suggested that where a mark is used on products whose principal purpose is to convey a message, such as posters or T-shirts, the distinction between trademark and nontrademark use becomes more difficult. *See L.L. Bean,* 811 F.2d at 32 n. 4; Restatement (Third) of Unfair Competition § 25 cmt. f (Reporter's Note). Perfume is not such a product, although one could make the argument that novelty items, such as pet perfume, do fall into that category, because the product itself is part of the joke. *Cf. Schieffelin & Co. v. Jack Co. of Boca, Inc.,* 725 F.Supp. 1314, 1324 (S.D.N.Y.1989) ("Cases involving novelty items are the best examples of parody precluding any possibility for consumer confusion.")

Amendment does not extend to such use, or to the extent that it does, the balance tips in favor of allowing trademark recovery, if in fact consumers are likely to be confused. *See Harley–Davidson,* 164 F.3d at 812–13; *United We Stand Am., Inc., v. United We Stand, Am. N.Y., Inc.,* 128 F.3d 86, 93 (2d Cir.1997); *Schieffelin & Co. v. Jack Co. of Boca,* 850 F.Supp. 232, 249 n. 9 (S.D.N.Y.1994). When a parodist makes trademark use of another's mark, it should be entitled to less indulgence, even if this results in some residual effect on the free speech rights of commercial actors.

█ Nevertheless, even without recourse to the First Amendment, Nature Labs' comical adaptation is still relevant to the extent that the joke is clear enough to result in no confusion under the statutory likelihood of confusion analysis. In such cases, "parody is not really a separate 'defense' as such, but merely a way of phrasing the traditional response that customers are not likely to be confused as to source, sponsorship or approval." *Schieffelin,* 725 F.Supp. at 1323. In determining whether there is a likelihood of confusion, courts in this Circuit are guided by the eight-factor test articulated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961). These factors are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap between the products; (5) actual confusion; (6) the defendant's bad faith in adopting plaintiff's mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers. Although these factors plainly involve factual inquiries, the application of these factors to the ultimate question of likelihood of confusion is a question of law. *See Hormel Foods Corp. v. Jim Henson Prods.,* 73 F.3d 497, 502 (2d Cir.1996); *Cliffs Notes,* 886 F.2d at 495. Thus, where the relevant facts are undisputed, or fall one way as a matter of law, summary judgment is appropriate. *See Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 116 (2d Cir.1984).

### 1. Strength of Plaintiff's Mark

█ It is undisputed that plaintiff's mark is widely recognized. (Harris Dep. at 51–52) In the usual trademark case, a strong mark is a factor pointing toward a likelihood of confusion. However, "[w]here the plaintiff's mark is being used as part of a jest ... the opposite can be true." *Yankee Publ'g,* 809 F.Supp. at 273; *see also N.Y. Stock Exch.,* 69 F.Supp.2d at 484 (citing *Hormel Foods,* 73 F.3d at 502–03). "The strength and recognizability of the mark may make it easier for the audience to realize that the use is a parody and a joke on the qualities embodied in trademarked word or image." *McCarthy on Trademarks and Unfair Competition* § 31:153 (4th ed.2001) [hereinafter "*McCarthy* "]. That is, it is precisely because of the mark's fame and popularity that confusion is avoided, and it is this lack of confusion that a parodist depends upon to achieve the parody. *See Hormel Foods,* 73 F.3d at 503; *Schieffelin,* 850 F.Supp. at 248. ("Certainly it is unremarkable that [defendant] selected as the target of parody a readily recognizable product; indeed, one would hardly make a spoof of an obscure or unknown product!"). In the present case, Nature Labs' adaptation of Hilfiger's famous mark likely allows consumers both immediately to recognize the target of the joke and to appreciate the obvious changes to the marks that constitute the joke. A distinctive mark will not favor plaintiff in these circumstances.

### 2. Similarity of the Marks

The marks are undeniably similar in certain respects. There are visual and phonetic similarities between the words "Tom-

my Hilfiger" and "Tommy Holedigger" or even "Timmy Holedigger." Nature Labs admits that its logo deliberately mimics Hilfiger's and is based upon the Hilfiger mark. (Harris Dep. at 52) It is necessary for the pet perfume to conjure up the original designer fragrance for there to be a parody at all. However, a parody also relies on "equally obvious dissimilarit[ies] between the marks" to produce its desired effect. *Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F.Supp. 785, 790 (E.D.N.Y. 1983). "If the difference in wording or appearance of the designation together with the context and overall setting is such to convey to the ordinary viewer that this is a joke, not the real thing, then confusion as to source, sponsorship, affiliation, or connection is unlikely." *McCarthy* § 31:155. Here, "the very broadness of the joke is a measure of the difference" between Hilfiger's marks and Nature Labs' pet perfume. *Tetley*, 556 F.Supp. at 790. The whimsical substitution of the dog-related pun, "Holedigger," on dog perfume, and in some versions, the use of the bone-shaped logo, clearly convey a joking variation on the original. In addition to these changes, there are further alterations to the Hilfiger trademarks on both the early and current pet perfume label designs. In the original "Tommy Holedigger" label, the red and white square are reversed and a different font is used. In the current version, "Tommy" is changed to "Timmy," and the colors and shapes are revised: the red and white squares are changed to red and yellow triangles.

These changes reinforce the imitative, yet comedic scheme inherent in a humorous takeoff.

"Moreover, an inquiry into the degree of similarity between the two marks does not end with a comparison of the marks themselves." *Hormel Foods*, 73 F.3d at 503 (citation omitted). One must also look to context, because "the setting in which a designation is used affects its appearance and colors the impression conveyed by it." *Id.* As noted, the marks in this case appear on pet perfume, a product which itself underscores the parody or pun captured in the label. Further, the packaging of the product bears headings or slogans that highlight the intended silliness. These include: "famous pet perfume"; "Strong enough for a man, but made for a chihuahua"; "T. Holedigger keeps your best friend smelling fresh and clean"; "If You Like Tommy Hilfiger, Your Pet Will Love Timmy Holedigger." (Lessem Decl. Exs. C, D, & E) As another Court put it, "such broad satirical adaptation draws a heavy line between itself and the object of satire." *Tetley*, 556 F.Supp. at 785. The last of the above-listed slogans also references a statement in red print on the back of the product that explicitly disclaims any relation between defendant and Tommy Hilfiger.[5] Finally, the Tommy/Timmy Holedigger product is always presented to the consumer along with a variety of other parody pet colognes, such as CK–9 and Pucci, each appearing in an identically shaped bottle. As Nature Labs argues, this context immediately reinforces the

---

5. Some courts have found that slogans comparing the original product with an imitation product can contribute to a likelihood of confusion, even when paired with the use of a disclaimer. *See, e.g., Charles of the Ritz, Ltd. v. Quality Distribs., Inc.*, 636 F.Supp. 433, 437 (S.D.N.Y.1986) (Weinfeld, J.). Considering the "combination of circumstances surrounding defendant's marketing of [its product]" in this case, *id.*, I do not find that a statement advertising that if *you* like Hilfiger, *your pet* will love Holedigger raises an issue of fact on confusion. Further, although a disclaimer alone is insufficient to dispel confusion, when the context ensures that consumer confusion is diminished, the use of a disclaimer can be of added benefit in obviating confusion. *See Charles of the Ritz, Ltd. v. Quality Distribs., Inc.*, 832 F.2d 1317, 1324 (2d Cir.1987).

message that the perfumes are a parody, and that they come from a single source rather than the multiple sources of the parodied marks.

Taken as a whole and in context, as it should be for a fair evaluation, Nature Labs' presentation accomplishes what the Second Circuit has said it must: "A parody must convey two simultaneous—and contradictory messages—that it is the original but also that it is not the original and is instead a parody." *Cliffs Notes*, 886 F.2d at 494. Because the parody is sufficiently strong, the similarities between the marks are outweighed by the differences, and do not contribute to a likelihood of confusion.

### 3. Proximity of the Products

Although an action for trademark recovery is not limited to cases involving competing products, courts are most vigilant to guard against a likelihood of confusion when the plaintiff and defendant use their marks on directly competing products. *See, e.g., Polaroid*, 287 F.2d at 495–498. This is true both generally and in particular as to parodies. Thus, even where the use is humorous, courts have shown little tolerance where the mark is used on a competing product. *See, e.g., Harley–Davidson*, 164 F.3d at 812–13 ("We have accorded considerable leeway to parodists whose expressive works aim their parodic commentary at a trademark or trademarked product, but have not hesitated to prevent a manufacturer from using an alleged parody of a competitor's mark to sell a competing product."); *Gucci Shops, Inc. v. R.H. Macy & Co.*, 446 F.Supp. 838, 839–40 (S.D.N.Y.1977) (GUCCHI GOO diaper bag found to infringe GUCCI tote bags); *Nabisco Brands, Inc. v. Kaye*, 760 F.Supp.

25 (D.Conn.1991) (A2 steak sauce held to infringe A1 steak sauce); *cf. N.Y. Stock Exch.*, 69 F.Supp.2d at 493 (distinguishing other cases on the basis that this case "involves some degree of satiric expression by a non-competitor"); *Deere*, 41 F.3d at 44 (noting that joking uses of trademarks are deserving of less protection when the object of the joke is the mark of a directly competing product).

■ Hilfiger urges that its own cologne and the pet cologne fall within the same general class—fragrances—and thus are in competitive proximity. Hilfiger further cites testimony that the Holedigger product was created to smell like Hilfiger's fragrances, and is marketed by comparative advertising, to support a professed concern that the pet perfume may serve as a market substitute for its own product. This argument simply does not withstand scrutiny. The products in fact do not compete, and they occupy distinct, non-overlapping markets. Because pet perfume is for use on pets, not humans, the products "differ in essential character." *Recot Inc. v. Becton*, 2000 WL 1367190, 56 U.S.P.Q.2d 1859, 1861 (2000). Moreover, pet perfume, in its very conception, is a novelty item, a parody of an actual product, for which there is no market independent of the parody. As one Court has noted, "[c]ases involving novelty items are the best examples of parody precluding any possibility for consumer confusion." *Schieffelin*, 725 F.Supp. at 1324. Even if there is a connection between fragrances for pets and humans, or even if a dense and humorless consumer could mistakenly conclude that plaintiff itself sponsored the humorous line of fragrances, plaintiff's and defendant's products are sold in different kinds of stores—the former in department or designer stores, the latter in pet stores or gift shops—at markedly different prices.[6]

---

**6.** Hilfiger contends that though the pet perfume is inexpensive as compared to its own perfume, they are both "high-end" products in their respective categories. It cites the fact

that Nature Labs charges approximately twice as much for its pet perfume as one of its competitors. (Harris Dep. at 44–46) Howev-

*See Tetley,* 556 F.Supp. at 790–91. It is thus plain that the products do not have the market proximity to one another that could create a likelihood of confusion.

### 4. Likelihood Plaintiff Will Bridge the Gap

Plaintiff has presented no evidence that it is likely to bridge the gap and offer a pet perfume like defendant's, and the evidence does not suggest that the purchasing public would attribute such an enterprise to plaintiff. "In view of [plaintiff's] concern that [defendant's] use of [plaintiff's] marks may tarnish them, it would be surprising if [plaintiff] had such plans." *N.Y. Stock Exch.,* 69 F.Supp.2d at 485. This factor cannot favor Hilfiger.

### 5. Actual Confusion

Nor is there evidence of actual confusion in this case. This is not surprising, as a review of the factors thus far shows that the character and context of Nature Labs' products quickly dispels any confusion. Although actual confusion need not be shown for a plaintiff to prevail, "[i]f consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Id.* (quoting *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 228 (2d Cir.1999)). Where, as here, a product has been on the market for several years, the absence of evidence on this point is considered "a very significant deficiency." *Yankee Publ'g,* 809 F.Supp. at 274. Here, it is also significant that Nature Labs now parodies at least 13 other de-

signer brands, not one of which has complained about consumer confusion. *See Tetley,* 556 F.Supp. at 790. That loud silence gives rise to only one inference: consumers have not been confused.

### 6. Defendant's Bad Faith

Plaintiff cites Nature Labs' intentional copying of Hilfiger's marks as evidence that defendant acted in bad faith. That evidence, however, does not show that defendant acted with the intent relevant in trademark cases—that is, an intent to capitalize on consumer deception or hitch a free ride on plaintiff's good will. *See N.Y. Stock Exch.,* 293 F.3d 550, 556 n. 1; *Yankee Publ'g,* 809 F.Supp. at 275. Although it is true that the deliberate adoption of a similar mark may give rise, in the usual case, to a presumption that the copier intended to confuse consumers, in the case of parody, "the intent is not necessarily to confuse the public but rather to amuse":

> In one sense, a parody is an attempt to derive benefit from the reputation of the owner of the mark, if only because no parody could be made without the initial mark. The benefit to the one making the parody, however, arises from the humorous association, not from public confusion as to the source of the marks.

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1486 (10th Cir.1987) (holding that LARDASHE mark on jeans for oversized women was an intentional parody of JORDACHE, but finding no intent to confuse); *accord Anheuser–Busch,* 962 F.2d at 321–22. The commercial success of a parodist's product is attributable to consumers who purchased because "they were amused by the cleverness of its design," and not because they believed it to

---

er, this is not enough for plaintiff to prevail on this factor because there is no indication consumers will associate price points of products that are not sold in a common retail

establishment and that do not even fall within the same class of goods. *Schieffelin,* 850 F.Supp. at 244–45.

be the original. *Anheuser–Busch*, 962 F.2d at 322. Of course, confusion can exist despite the intent to create a parody. "[The] single concern here, however, is whether an intent to parody an existing trademark supports an inference of a likelihood of confusion.... [I]t does not. An intent to parody is not an intent to confuse the public." *Jordache*, 828 F.2d at 1486.

### 7. Quality of Defendant's Product

The next factor in the Polaroid analysis can cut either way, depending on the product involved. "An inferior product may cause injury to the plaintiff trademark owner because people may think that the senior and junior user came from the same source; or ... products of equal quality may tend to create confusion as to source because of this very similarity." *Hormel Foods*, 73 F.3d at 505. In any event, there is no evidence in this case regarding the quality of defendant's product.

### 8. Sophistication of Consumers

The final factor to be considered is the sophistication of the consumers and the degree of care likely to exercised in purchasing the product. This factor also fails to assist plaintiff. Although the record does not disclose the exact price of Hilfiger's product, both sides agree that it is a "high-end" designer fragrance. The substantial price associated with such goods "requires buyers to exercise care before they part with their money, and such sophistication generally militates against a finding of confusion." *Charles of the Ritz*, 832 F.2d at 1323. It is also counterintuitive that buyers of any sophistication will "impulse buy" a bottle of pet perfume priced at $10.00 a bottle. "To the extent that a shopper might make such a purchase, it would likely be after viewing the bottle carefully, grasping the joke, and seeking to share it with others." *Schieffelin*, 850 F.Supp. at 250; *see also id.* ("This case is not one where unsophisticat-

ed customers may fall prey to similar marks of inexpensive products that are in competitive proximity with each other.") Because defendant's "theme and pun on the [Hilfiger] marks are obvious, even a minimally prudent customer would not be confused by the source or affiliation of [defendant's products]. The purchasing public must be credited with at least a modicum of intelligence." *N.Y. Stock Exch.*, 69 F.Supp.2d at 487.

An analysis of the foregoing factors yields the conclusion that there is no triable issue of fact on the likelihood of confusion. Rather, defendant's use of the mark is an obvious parody or pun, readily so perceived, and unlikely to cause confusion among consumers. *Compare N.Y. Stock Exch.*, 293 F.3d 550 (granting defendant summary judgment on infringement claims because a Las Vegas casino's use of "New York Slot Exchange" on a replica of the Stock Exchange was an "obvious pun and would not cause any confusion among consumers"), *Hormel Foods*, 73 F.3d 497 (holding that the Muppet puppet "Spa'am" was an obvious parody of the luncheon meat SPAM and thus not likely to cause confusion), *Tetley*, 556 F.Supp. 785 (concluding that "Wacky Pack" sticker featuring "Petley Flea Bags" was a heavy-handed parody of TETLEY tea bags unlikely to cause confusion), *with Schieffelin*, 850 F.Supp. 232 (finding DOM POPIGNON popcorn was not a sufficiently strong parody of DOM PERIGNON champagne to avoid confusion, and explaining "[t]his conclusion is compelled in large measure by the evidence of actual confusion").

Hilfiger fails to see the humor in all of this. In support of its dour position on the subject, it cites two opinions in which dog treats parodying human food items were found to infringe on the owner's marks. *See Recot*, 2000 WL 1367190, 56 U.S.P.Q.2d 1859 (refusing to register the

mark FIDO–LAY for dog treats because of the likelihood of confusion with FRITO–LAY (but "confess[ing] that [they] have at least some doubt about [their] conclusion")); *Grey v. Campbell Soup Co.*, 650 F.Supp. 1166 (C.D.Cal.1986) (DOGIVA dog biscuits held to infringe GODIVA chocolates), *aff'd*, 830 F.2d 197 (9th Cir.1987) (unpublished table decision). I find these cases distinguishable on at least three relevant grounds: first, the dog and human products in those cases were both offered for sale in the same retail establishments; second, unlike *Grey*, there is no evidence of actual confusion in this case; and third, dog treats are not inherently a parody item as pet perfume is. To the extent these cases are on point, I respectfully disagree with them.

Hilfiger, and perhaps some others, would do well to read *McCarthy* on the subject: "No one likes to be the butt of joke, not even a trademark. But the requirement of trademark law is that a likely confusion of source, sponsorship, or affiliation must be proven, which is not the same thing as a 'right' not to be made fun of." *McCarthy* § 31:155; *see also Anheuser–Busch*, 962 F.2d at 322 ("The purpose of the Lanham Act is to eliminate consumer confusion, not to banish all attempts at poking fun or eliciting amusement… [or] deprive the commercial world of all humor and levity."). Although Hilfiger is unamused, it has not offered evidence on the issue of confusion that would justify denying Nature Labs' motion for summary judgment. That motion therefore is granted.

B. *Trademark Dilution*

■ Plaintiff's claims of trademark dilution under section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and New York General Business Law § 360–1, are also dismissed.

The federal antidilution act prohibits the commercial use of another person's famous mark where the junior use causes "dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. 1127. Similarly, "a likelihood of injury to business reputation or dilution of the distinctive quality of a mark or trade name" will entitle plaintiff to prevail on its state law claim of dilution, "notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y. Gen. Bus. Law § 360–1.

It is undisputed that Hilfiger's marks have the requisite fame and distinction to warrant protection under the antidilution statutes. See *N.Y. Stock Exch.*, 293 F.3d 550, 555–58. The remaining issue is whether Nature Labs' use is likely to dilute the marks. Traditionally, dilution under state law has involved "either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Deere*, 41 F.3d at 42–43 (quoting *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir.1989)). These same claims have been held to be actionable under the newer federal provision as well. See *N.Y. Stock Exch.*, 69 F.Supp.2d at 489.

1. Blurring

■ "[D]ilution by 'blurring' may occur where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Deere*, 41 F.3d at 43. It

typically involves "the whittling away of an established trademark's selling power through its unauthorized use by others upon dissimilar products." *Id.* (citation omitted).

Although a likelihood of confusion is not necessary to find dilution, and indeed may be inconsistent with such a finding,[7] many of the factors relevant to a likelihood of confusion are also relevant to a likelihood of dilution. *See* Restatement (Third) of Unfair Competition § 25 cmt. f; *see also N.Y. Stock Exch.,* 293 F.3d 550, 558; *Nabisco,* 191 F.3d at 217–222; *Yankee Publ'g,* 809 F.Supp. at 282. In this case, the above discussion of the confusion factors also disposes of Hilfiger's blurring claim. *See id.* Rather than result in this type of dilution, Nature Labs' spoof, like other obvious parodies, "tends to increase public identification of a plaintiff's mark with the plaintiff." *Jordache,* 828 F.2d at 1490 (citation omitted); *see Hormel,* 73 F.3d at 506. That is, "the use of famous marks in parodies causes no loss of distinctiveness, since the success of the use depends upon the continued association of the mark with the plaintiff." *Yankee Publ'g,* 809 F.Supp. at 282 (citation omitted). This may be true even when the parody is itself part of a trademark use. *See, e.g., N.Y. Stock Exch.,* 293 F.3d 550, 558; Denicola, *supra,* at 188–89 (citing cases and explaining: "The presence of a famous mark on certain products may have little diluting effect, particularly where it is obvious that the defendant intends the public to associate the use with the true owner .... [T]he joke itself reinforces the public's association of the mark with the plaintiff.") In this instance, the possibility of dilution by blurring is remote. Rather, as in the case

of the "Petley Flea Bag" stickers, "the broad humor defendant employs serves to prevent the type of blurring which might result from a more subtle or insidious effort at humor at plaintiff's expense." *Tetley,* 556 F.Supp. at 794. Given the nature of the challenged use, then, and the utter lack of evidence that the selling power of Hilfiger's marks has been diminished, no rational trier of fact could conclude that Nature Labs' pet perfume is likely to impair the identification of Hilfiger's marks with its products.

### 2. Tarnishment

■ " 'Tarnishment' " generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product. *Deere,* 41 F.3d at 43. The reputation of the trademark is harmed and its value reduced "because the public will associate the lack of quality or prestige in the defendant's goods with the plaintiff's unrelated goods," or because the mark ceases to serve as a "wholesome identifier of the owner's products." *Id.*

■ In the present case, Hilfiger has submitted no evidence on whether there is a disparity in quality between its own fragrance and the pet perfume. Rather, it complains merely that "Nature Labs' use of 'Tommy Hilfiger' and an imitation of the Hilfiger Flag Design to sell cologne for dogs projects an image at odds with Hilfiger's reputation for high-quality fragrance products for humans." (Pl. Supp. Mem. at 4–5) Plaintiff is correct in pointing out that "tarnishment is not limited to seamy conduct," *see Hormel,* 73 F.3d at 507, and that it is "enough that the image projected by

---

7. "[T]he state of mind required for confusion and dilution are distinct and inconsistent. Confused consumers believe that the actor's use of the mark indicates a connection with the trademark owner, and thus for those consumers, the actor's use does not dilute the distinctiveness of the mark." Restatement (Third) of Unfair Competition § 25 cmt. f (Reporter's Note).

the defendant's mark and services [is] at odds with the image projected by the plaintiff's mark and services," Pl. Supp. Mem. at 4; *see N.Y. Stock Exch.*, 293 F.3d 550, 558. However, "[t]he sina qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel*, 73 F.3d at 507. Here, plaintiff has not put forth any evidence supporting such a conclusion, nor would I expect to find any. *See Tetley*, 556 F.Supp. at 794. Although the *Grey* Court speculated that DOGIVA and CATIVA animal treats would likely tarnish GODIVA chocolates for humans, 650 F.Supp. at 1175, I find that no rational jury could reach the same animal-unfriendly conclusion here. There is nothing to suggest that a designer label has anything to lose from mere association with pets, particularly where the entire association is a light-hearted if somewhat heavy-handed parody. I agree with the conclusion of the district court in *Jordache:* "When the association is essentially a harmless, clean pun, which merely parodies or pokes fun at the plaintiff's mark, tarnishment is not likely." *Jordache Enters. v. Hogg Wyld, Ltd.*, 625 F.Supp. 48, 57 (D.N.M.1985), *aff'd*, 828 F.2d 1482 (10th Cir.1987); *see also McCarthy* § 31:155 (quoting *id.*). Even *Deere*, the case upon which Hilfiger principally relies, notes: "Not every alteration will constitute dilution, and more leeway for alterations is appropriate in the context of satiric expression and humorous ads for noncompeting products." *Deere*, 41 F.3d at 45; *see also Hormel*, 73 F.3d at 507–08 (holding that a benign parody product that was not in direct competition with plaintiff's product was unlikely to cause dilution). That observation applies in this case, and I find for defendant on plaintiff's dilution claim.

## C. *False Advertising*

■ Plaintiff's final claim is for false advertising, based on the comparative statement on the Timmy Holedigger label that reads, "If you like Tommy Hilfiger, your pet will love Timmy Holedigger." Hilfiger alleges that the asserted similarity between the scent of Timmy Hilfiger and the fragrance products sold under the Hilfiger trademarks is a "false and misleading claim." (Pl. Supp. Mem. at 15).

■ Comparative advertising is often the basis for a false advertising claim, *see McCarthy* § 27:59, yet the analysis of any such claim must begin with the recognition that comparative advertising is not only permissible, but encouraged. Such advertisements serve the "beneficial purpose of imparting factual information about the relative merits of competing products." *Deere*, 41 F.3d at 44. It has repeatedly been held that one may copy the unpatented formula of another's product and may use that product's trademark in its advertising to identify the product it has copied. *See Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 668 (8th Cir.1987); *Smith v. Chanel, Inc.*, 402 F.2d 562, 563 (9th Cir.1968), and its progeny. Indeed, courts have upheld so-called "like/love" slogans such as the one at issue here. *See id.; Diversified Mktg., Inc. v. Estee Lauder, Inc.*, 705 F.Supp. 128 (S.D.N.Y.1988). The only limitations the Lanham Act imposes on these slogans are that the advertiser cannot make false claims about the similarity of the products involved, and that the advertiser cannot use another product's mark in a way that is likely to confuse consumers about the source of the advertiser's product. *See Saxony Prods., Inc. v. Guerlain, Inc.*, 513 F.2d 716, 722 (9th Cir.1975); *Charles of the Ritz*, 636 F.Supp. at 435. Liability on the latter theory has been discussed and rejected, *see supra* p. 13–14 & n. 5, because the parodic context in which the statement appears sufficiently cures any consumer confusion. The subject claim here rests on Hilfiger's assertion that the advertisement is untruthful.

Once again, that the statement in question is attached to a parody product is relevant to the applicability of the Lanham Act's proscription of false claims. Although Nature Labs asserts that its claim is true, it is hard to imagine anyone relying on the truth of Nature Labs' statement in the same way one does when trying to buy a lower-cost copy of a product in the typical "like/love" case. A statement drawing a likeness between the buyer's own taste and that of his or her pet is unverifiable puff. The injury plaintiff will suffer, and upon which standing to bring this claim is based, is not as clear as in other comparative advertising cases, where the parties are competitors. *Cf. Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 694–697 (2d Cir.1994) (discussing standing requirements and citing relevant case law). To put the point in the form of a question, is Hilfiger likely to be damaged by a diversion in sales, either through pet-owners ceasing to use Hilfiger products on their pets or starting to use pet perfume on themselves? Somehow, I don't think so. Nevertheless, the Second Circuit has held, albeit in the context of competing products, that harm will be presumed in cases of false comparative advertising that mentions plaintiff's product by name. *See McNeilab, Inc. v. Am. Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988). I will therefore apply that presumption here.

Turning to the merits then, the relevant portion of the Lanham Act prohibits any "false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origins of [the advertiser's] goods." 15 U.S.C. § 1125(a). To prevail, a plaintiff must show either: (1) that an advertisement is literally false; or (2) that the advertisement, though literally true, is likely to mislead or confuse consumers. *See S.C.*

*Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 238 (2d Cir.2001).

Hilfiger rests its claim of falsity upon the deposition testimony of Nature Labs' John Harris, in which Harris admitted never having done a comparison or chemical analysis of the two products. (Harris Dep. at 56) In making its pet perfume, Nature Labs buys its fragrances from several third parties and mixes it with alcohol to achieve the desired scent. The testing of the product consists of Harris's spraying the product on himself. (*Id.* at 105–06) However, where an advertiser makes a simple claim of equivalence, as is the case here, it is not enough to show that the claim is unsubstantiated. Rather, plaintiff must show affirmatively that the statement is false. *See Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 62–63 (2d Cir.1992) (citing *Procter & Gamble Co. v. Chesebrough–Pond's Inc.,* 747 F.2d 114, 119 (2d Cir.1984)). The only other evidence on the scent of the pet perfume is Harris's testimony that the Tommy/Timmy Holedigger cologne smells like his recollection of the scent of Hilfiger cologne. (Harris Dep. at 56) Plaintiff offers no evidence as to the composition or olfactory impression of the two perfumes, and therefore plaintiff's claim of literal falsity fails as a matter of law.

To the extent plaintiff is not relying on literal falsity, and instead is arguing that the statement is misleading, plaintiff still fails to meet its burden. To prevail on this theory, plaintiff is required to "produce consumer surveys or some surrogate to prove whether consumers expect the advertising claim to be substantiated and whether they expect the level of substantiation to be greater than that which the defendant has performed." *McCarthy* § 21:61 (citing *Sandoz Pharm. Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3d Cir.1990)); *Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc*

*Rorer Pharm., Inc.,* 19 F.3d 125 (3d Cir. 1994); *see also L & F Prods. v. Procter & Gamble Co.,* 45 F.3d 709, 711 (2d Cir.1995) (explaining that extrinsic evidence must confirm that a commercial is likely to mislead consumers); *Coors Brewing Co. v. Anheuser–Busch Cos., Inc.,* 802 F.Supp. 965, 969 (S.D.N.Y.1992) (same). Plaintiff has not offered any such evidence. Because plaintiff has not put forth a genuine issue as to a material fact, there is no triable dispute, and summary judgment for defendant is proper.

\*　　\*　　\*

For the reasons set forth above, defendant's motion for summary judgment is granted. As the Ninth Circuit recently counseled both parties in a bitterly contested trademark parody case, plaintiff is "advised to chill." *Mattel, Inc. v. MCA Records, Inc.,* No. 296 F.3d at 908 (9th Cir.2002).

SO ORDERED.